# Godau v. The State.

## *Murder.*

(Decided January 21, 1913.  Rehearing denied February 13, 1913. 60 South. 908.)

1. *Criminal Law; Venue; Change of; Burden of Proof.*—Where a defendant moves for a change of venue on the ground that he could not have a fair and impartial trial in that county, he has the burden of showing to the reasonable satisfaction of the court that an impartial trial and an unbiased verdict cannot be reasonably expected.

2. *Same; Review.*—Under section 7851, Code of 1907, as amended by Act of 1909, page 212 the refusal of an application for a change of venue on the ground that the defendant could not have a fair and impartial trial, the appellate court is to consider the question under the same rules as the trial court, having relation to the time of the application.

3. *Jury; Summoning; Service.*—A juror may be summoned by being served personally or by leaving a notice in writing at his place of residence with some one residing there, under the express provision of section 16, Acts 1909, page 311.

4. *Same; Special Venire; Drawing.*—The distinction between "presiding judge" and "the court" is abrogated by the present jury law, and it is enough that the record shows that the court in open court drew the special venire.

5. *Same; Competency.*—Although on the first voir vire a juror states that he has a fixed opinion as to the guilt or innocence of defendant which will bias him in his verdict, he is properly pro-

nounced competent where on further examination he states that he can go into the jury box and try the case and render a verdict solely on the evidence.

6. *Same.*—Where a juror states on his voir vire that he has a fixed opinion against capital punishment he is properly excluded for cause when drawn as a juror for the trial of a capital felony.

7. *Same; Qualification; Citizenship.*—One born an alien and who has not complied with the naturalization laws is not competent as a juror, whatever may have been the length of his residence, as only citizens are qualified to sit as jurors.

8. *Same.*—One whose real name is "Bomboy" is competent to serve in a case as a juror although summoned in the name of "Bombay," he testifying that he was as well known by this name as by his real name.

9. *Evidence; Confessions; Admissibility.*—Whether or not a confession is voluntary and admissible is a question for the trial court, yet in determining the weight to be given the confession the jury may look at the evidence relative to its voluntariness.

10. *Same; Predicate.*—Confessions are prima facie involuntary and unless the circumstances attending them show that they were voluntary, they should not be admitted without evidence showing prima facie that they were voluntary.

11. *Same; Transcript of Short Hand Notes.*—A stenographer's transcript of his short hand notes taken at a coroner's inquest is properly admitted as the original in a murder trial; but if it be desired to impeach the correctness of such transcript comparison may be had with the original notes.

12. *Witnesses; Competency; Infants.*—Whether a child of tender years is of sufficient intelligence and sufficiently appreciates the sanctity and nature of an oath to qualify him to testify is a question addressed largely to the discretion of the trial judge.

13. *Charge of Court; Covered by Those Given.*—Where the charges given cover all phases of the case and testimony as favorably to the defendant as he has a right to ask, the court will not be put in error for refusing to give correct charges requested.

14. *Jury; Drawing; Capital Cases.*—Under section 32, Acts 1909, page 317, the trial being in Mobile, and the number of competent jurors being less than twenty, the court properly limited the drawing of jurors to increase the number to at least thirty, to persons living within the city.

APPEAL from Mobile City Court.

Heard before Hon. O J. SEMMES.

Mary E. Godau was convicted of murder and she appeals. Affirmed.

LEIGH & CHAMBERLAIN, for appellant. The lower court erred in refusing to grant the application of the

[Godau v. The State.]

defendant for a change of venue in view of the testimony and the newspaper articles written at the time of the commission of the alleged offense and the court will review it here, without any presumptions favorable to the finding of the lower court. The affidavits filed by the state did not deny the truth of defendant's affidavits but only stated that the affiant did not believe that there was any such prejudice or excitement as would deny defendant a fair trial.—*Birdsong v. State,* 47 Ala. 68; *Seames v. State,* 84 Ala. 413; *Hawes v. State,* 88 Ala. 53; *Thompson v. State,* 117 Ala. 67; *Posey v. State,* 73 Ala. 494; *Dixon v. State,* 58 South. 5. The court erred in summoning and organizing the jury for the trial of this case.—Section 32, Acts 1909, page 219; *Scott v. State,* 141 Ala. 40; *Kinnebrew v. State,* 132 Ala. 8; *Burton v. State,* 115 Ala. 1. The act of the court is not the act of the presiding judge.—*Scott v. State, supra; Wright v. State,* 136 Ala. 15. The juror McKinstry had a fixed opinion and was incompetent. —*Jackson v. State,* 77 Ala. 18; *Hammil v. State,* 90 Ala. 577. The juror Bodden was competent, although he had not taken out naturalization papers.—Section 11, Acts 1909, page 309; *Smith v. B'ham Water Works Co.,* 104 Ala. 315; 2 Words & Phrases, 1170; 35 Amer. Rep. 536; 14 Texas, 594; 55 Mass. 531. Bombay and Bomboy are not idem sonans and the court erred in overruling the challenge as to that juror.—*Merlette v. State,* 100 Ala. 42; *Munkers v. State,* 87 Ala. 94; *Jacobs v. State,* 61 Ala. 448. The confessions of the defendant are not shown to be voluntary and were therefore not admissible as such.—*Martin v. Williams,* 163 Ala. 663; *Holt v. Agnew,* 67 Ala. 360; *Harris v. Carmody,* 41 Amer. Rep. 188; *McAlpine v. State,* 117 Ala. 93; *Hunt v. State,* 135 Ala. 8; *Perkins v. State,* 66 Ala. 457; 12 Cyc. 471; *Redd v. State,* 69 Ala. 255. The stenogra-

pher should have read his original notes and not the transcript of the same, if it can be said that either of them were admissible.—*Jaques v. Horton,* 76 Ala. 238; *Acklen v. Hickman,* 63 Ala. 494. Counsel discuss other assignments of error relative to the evidence but without further citation of authority. The child was not shown to be competent to testify.—*Carter v. State,* 63 Ala. 54; *White v. State,* 136 Ala. 66. Charge 20 should have been given.—*Bones v. State,* 117 Ala. 138. Charge 36 should have been given.—93 S. W. 379. Charge 37 should have been given.—39 S. E. 676. Charge 39 should have been given.—*Grant v. State,* 97 Ala. 35. Charge 42 should have been given.—*Harkness v. State,* 129 Ala. 79. Charges 45 and 46 were proper and should have been given.—*Bluett v. State,* 151 Ala. 48. The court erred in refusing charge 61.—107 Ala. 41; 117 Ala. 13. Charge 64 should have been given.—6 Mayf. 108.

ROBT. C. BRICKELL, Attorney General and W. L. MARTIN, Assistant Attorney General, for the State. The presumption is indulged that the ruling of the trial court denying a change of venue was free from error. —*McDaniels v. State,* 162 Ala. 25. The petition does not present a case strong enough to authorize this court to revise the action of the trial court.—*Lide_v. State,* 133 Ala. 43; *Thompson v. State,* 122 Ala. 12; *Terry v. State,* 120 Ala. 286 and cases therein cited. The sheriff properly served the juror by leaving written notice at his residence with a member of his family.—Section 16, Acts 1909, page 311. The jurors excused for cause were properly excused.—*Whatley v. State,* 144 Ala. 68; *Calhoun v. State,* 143 Ala. 11; *Griffin v. State,* 90 Ala. 596; *Garrett v. State,* 76 Ala. 18 and cases therein cited. The court properly declined to quash venire on account

of improper spelling of the name of the juror Bombay. —*Longmier v. State*, 130 Ala. 66; *Cawley v. State*, 133 Ala. 128; *Smith v. State*, 145 Ala. 17; *Untrienor v. State*, 146 Ala. 26. The court properly admitted the confessions of the defendant as it sufficiently appeared that they were voluntary.—*King v. State*, 40 Ala. 316; *Steele v. State*, 83 Ala. 20; *Dodson v. State*, 86 Ala. 60; *Becham v. State*, 100 Ala. 15; *Shields v. State*, 104 Ala. 35; *Huffman v. State*, 130 Ala. 89; *Bush v. State*, 136 Ala. 85. The court properly permitted the introduction of the transcript of the court stenographer taken at the coronor's inquest.—2 A. & E. Ency. of Law, 283. At the written request of the defendant the court gave charges covering every phase of the case as favorably to the defendant as she was entitled to, and hence there was no error in refusing the charges complained of.

DE GRAFFENRIED, J.—In the present case the defendant, Mary T. Godau, was indicted for murder in the first degree. She was tried for and convicted of that offense and was sentenced to imprisonment in the penitentiary for life.

(1) She was indicted for the murder of her son-in-law, who was, at the time of his death, a member of the police force of the city of Mobile and also a member of three fraternal organizations of that city who insured the lives of their members. The body of the dead policeman was found in a pond near his home. It was dressed in his uniform, but bullet holes through his head disclosed the fact of his murder. Suspicion pointed to the defendant and her daughter, the dead man's wife, as the murderers. The theory was that they had murdered him to get the insurance on his life. Finally the defendant and her daughter were lodged in jail, charged with the murder, and it was at once claimed

that the defendant had confessed to the murder, taking all the blame upon herself and exonerating her daughter. The newspapers of Mobile—and they were widely read and circulated there—teemed with sensational accounts of the murder, and in all of these accounts the guilt of the defendant was assumed as a fact. Pictures of the defendant and of her daughter and of the dead policeman, as well as of the sheriff and probably some of his assistants, also appeared in the Mobile papers, and, to be short, the newspapers of Mobile did all that newspapers can do to create the impression that the defendant was certainly guilty of the murder. In addition to this, they undertook to go into the past of the defendant. She appears to have been three times married, and it was broadly hinted in the papers that the defendant had murdered two, and probably all three, of her husbands. In fact, this defendant was pictured in the Mobile newspapers—and we presume that they were read by everybody—as one of the worst criminals who ever lived. Whether the defendant deserved all that was said of her by the papers we do not know; but, as we read the articles as they appear in this record, the facts are as we state them.

It further appears that the defendant, at the coroner's inquest, held about the time the body of the dead policeman was found, appeared and testified as a witness. The substance of her testimony on that occasion was that her son-in-law worked on the police force at night; that he was in his room asleep; that every one had left the house except herself; that at 6 o'clock p. m. she went to his room to wake him, and when she did so, he undertook to ravish her; that in the scuffle he managed to get a pistol and shot it, and then, to use her own language: "He then goes back onto the bed, and he puts the pistol down, and he said, 'Come on, I

ain't worth anything more,' and he said, 'Shoot!' He put the pistol down, and I was just boiling and crazy, and I went over near him, and he said, 'Take it and kill me,' and he closed his eyes and said, 'I want to get out of it.' I then shot him in the head, but I didn't shoot him right, and he rolled over and moaned, and I saw him suffering, so I shot him again to get the man out of his misery, and he died in my arms." She then went on to describe how she dressed the body in the clothes of the policeman, how she hauled the body to, and then placed it in, the pond, and how she attempted to hide the evidences of the homicide. It appears that a large crowd of people were present at the coroner's inquest and heard the above testimony. It also appears that the defendant's testimony above referred to appeared in full in the papers of Mobile.

After the indictment against the defendant was preferred by the grand jury, she filed in the cause an application for a change of venue, and in support of the application she offered the above newspaper articles, together with the affidavits of 57 citizens of Mobile, in which the affiants state that they have read the said articles and heard large numbers of the citizens of Mobile express themselves, and that they are acquainted with the condition of public sentiment in Mobile county with reference to the defendant and that, in their opinion, the defendant cannot obtain a fair and impartial trial in Mobile county. Some, at least, of the above affidavits were made by men prominent in the legal and commercial affairs of the city of Mobile. The state, on the other hand, introduced affidavits signed by 148 citizens of Mobile, stating that in their opinion, after reading said newspaper articles and hearing said matter discussed by citizens of Mobile county, they are of the opinion that the defendant can receive a fair and

impartial trial in that county. Some, at least, of the above-named citizens were also prominent in the legal and commercial affairs of said city and county. The homicide occurred on the 31st of December, 1911, and the application for a change of venue was denied by the court on March 1, 1912.

(2) When an application for a change of venue in a criminal case is made to a *trial court,* it becomes, at once, the duty of the judge of that court in a fair, judicial, and impartial way, from the application and the evidence offered in support of and against it, to ascertain whether the defendant can reasonably be expected to obtain that fair and impartial trial at the hands of an unbiased and unprejudiced jury which the laws of every civilized community should accord to those charged with crime. The burden is upon the defendant to show "to the reasonable satisfaction of the court that an impartial trial and an unbiased verdict cannot be reasonably expected." If the trial judge comes to that conclusion, then the venue ought to be changed; if not, then it should not.—*Seams v. State,* 84 Ala. 410, 4 South. 521.

When a man is charged with a crime, he is, under the law, presumed to be innocent until his guilt has been, by the evidence, legally established, and his guilt can never be said to be legally established until, by the verdict of 12 impartial men legally qualified and impaneled to serve as jurors, he has, under the evidence in his case, been declared to be guilty. The state is broad enough and the law is strong enough to furnish every person who is charged with a crime with a fair and impartial jury, and when, upon an application for a change of venue in a criminal case, it is made to appear to the reasonable satisfaction of the presiding judge that such a jury cannot be reasonably expected

to be obtained to try the prisoner, then the application for a change of venue should be granted.

No jury can be said to be a fair and an impartial one unless its members are in a frame of mind to accord to the prisoner those presumptions in his favor which the *law* says *must* accompany him during his trial, and which, in a legal way, must be overcome before a legal conviction can be had. The question on such an application is not, "Is the defendant guilty?" or, "Is the offense with which the defendant stands charged a grave and heinous one?" or, "Shall punishment swiftly follow the perpetration of the crime?" but the true— *the only question*—is, "Can the defendant, *in this county, although guilty,* be *convicted* according to *law?*" When we say "convicted according to law," we mean a conviction under the law by a fair and an impartial jury. In many criminal cases the jury determines the amount and character of the punishment and "the *trial* must be *just,* as well as the *verdict* reached through its appliances."—*Seams v. State, supra.*

In the instant case the defendant has never denied that she killed her son-in-law, and she has always claimed that she did so because he assaulted her with intent to ravish her. The "confession" which appeared in the Mobile papers made a somewhat more damaging case against her than the testimony which she gave before the coroner, and her testimony before the coroner was less favorable to her cause than her testimony on the final trial. The serious matter in the newspapers which was calculated to prejudice her case with the public was the broad intimation that she had probably murdered two of her husbands and possibly three of them, and that her motive for killing her son in-law was to get the insurance on his life.

So long as we have newspapers we may expect to have through them the report of crimes, and it is not to be unexpected that, when a homicide is committed and discovered under circumstances like the present—even if the defendant's account of the entire matter is the truth—the newspapers of the community, answering the public interest, will furnish the defendant with at least some material upon which to base an application similar to the one under discussion. In the instant case the newspapers laid bare the real character of the deceased, and, if animosity was aroused against the defendant, it was due to no appeal which was made to popular passion on account of the character of the man who was killed, but because of the character of the crime, the uncanny disposition of the body of the deceased, and the frightful hints as to the defendant's history.

There were many (very many) people at the coroner's inquest, and many (very many) people heard the pitiable story which the defendant there gave as a witness under the sanctity of an oath. There cannot occur, however, a sensational homicide which does not arouse popular interest and popular discussion, and we presume that a similar coroner's investigation would, at any point, have been attended by many people. There was, *at all times,* however, *an entire absence,* so far as this record discloses, of any disposition on the part of any of the citizens of Mobile to do personal harm to the defendant, or any indication, at any time, that there was great public excitement or any danger whatever of mob violence. While some of the newspaper articles may have been calculated to arouse popular indignation against the defendant, and while many of the people who attended the coroner's investigation may have disbelieved the defendant's story, the entire ab-

sence of any popular demonstration against the pris-
oner and of all threats against her may have had some
weight with the trial judge in arriving at the conclu-
sion that, in the populous county of Mobile, the defend-
ant could be reasonably expected to obtain that fair
and impartial *trial* at the hands of an impartial jury,
to which, under the enlightened humanity of our law,
the defendant was entitled as a matter of legal jus-
tice and of right. While the trial judge had before him
a large number of affidavits of prominent men who stat-
ed that they had heard the matter discussed and that
they were acquainted with public sentiment in Mobile
and that they did not believe that the defendant could
obtain a fair and impartial trial in that county, he also
had before him a large number of affidavits of men
equally prominent in the affairs of the city who stated
the same facts in their affidavits, and they testified that,
in their opinion, the defendant could obtain a fair and
impartial trial in the county.

When excitement against a prisoner runs high, it is
frequently difficult for him to obtain the needed evi-
dence of the condition of the popular mind, in the shape
of affidavits stating the truth to support his application
for a change of venue, and as it is easy to float with
the current, it may be a comparatively easy matter,
in such instances, for the prosecution to obtain the
counter opinions of those who, even without their
knowledge and acting from the best of motives, really
suffer under "the insidious and potent duress of pub-
lic opinion," and for this reason the law says that, on
such an application, the trial judge must look to the
*facts* rather than to *mere opinions* stated in affidavits.
—*Seames v. State, supra.*

We have devoted much time to the discussion of the
above subject because it is a subject which addresses

itself to the fundamental principles governing the proper administration of our criminal law.—*Seames v. State, supra; Birdsong v. State,* 47 Ala. 68; *Murphy & Ashford v. State,* 45 Ala. 32; *Posey v. State,* 73 Ala. 494; *Johnson v. Commonwealth,* 82 Ky. 116.

Under the provisions of an act entitled an act "to amend section 7851 of the Code of Alabama," approved August 26, 1909, it is made the duty of this court to review and revise, on appeal, the action of a trial court in refusing to grant an application for a change of venue "without any presumption in favor of the judgment or ruling of the lower court on said application." —General & Local Acts, Special Sess. 1909, p. 212.

The burden, therefore, by virtue of the above act, no longer rests upon the appellant in such a case to overcome the presumptions which an appellate court ordinarily indulges in favor of the correctness of the findings and judgment of the trial court; but this court, in passing upon such a matter, is governed by the same rules which the law says must control the trial judge when he acts upon such an application. While this statute renders our task in passing on such matters difficult and delicate, it gives emphasis to the legislative purpose that, in this state, a trial by jury, in a criminal case, means a trial by a jury composed of impartial and fair-minded men.

In the present case the same reasons which we have above given as having probably controlled the trial court in refusing to grant Mrs. Godau a change of venue exert a controlling influence upon us in our refusal to disturb that ruling. Mrs. Godau is a crippled woman, and her sex and physical infirmities were a probable appeal to popular compassion in her behalf. Mobile is a populous county, and its county seat is a large city. There could not have existed any racial

prejudice against her, and the man with whose murder she was charged could not have possessed a wide personal popularity. There was, as we have already said, an entire absence of all personal animosity against her on the part of any of the people of Mobile, and we find that at no time was there the slightest indication of mob violence or even a threat of it.

While Mrs. Godau's evidence may tend to show that she was entitled to a change of venue, the law casts upon her the burden of establishing to our reasonable satisfaction that, at the time her application for a change of venue was denied, the condition of the public mind of Mobile county was such that an impartial trial and an unbiased verdict could not be reasonably expected in her case at the hands of a jury of that county. After a careful consideration of the application and the affidavits which were introduced in support of and against the application, we feel that Mrs. Godau failed to meet the burden above referred to, and it is our duty, under the law as it now exists, to affirm the action of the trial judge in refusing to grant the application for a change of venue.

(4) Section 16 of the act known as the new jury law (Pamp. Acts, Special Session 1909, p. 305) provides that, in summoning a juror, the sheriff shall serve the juror personally or shall leave a written notice at the place of residence of such juror with some member of his family, or some person residing in the same house, at least two days before the day appointed for the service of the juror in court. The record in this case shows that all of the regular jurors who were drawn and summoned for the week in which the defendant's case was set for trial, and in which it was actually tried, were summoned as above provided. There was therefore nothing in the defendant's objection to the

venire that all of the names of jurors which were served upon him as having been drawn and summoned for said week were not the names of jurors who had been served in *person* by the sheriff or one of his deputies. It was sufficient that they were all summoned in the manner provided by the statute.

(5) The record shows that the *court* in open court drew the special venire. This was sufficient. In the case of *Scott v. State,* 141 Ala. 40, 37 South. 366, a distinction under the then existing jury law was drawn between the "presiding judge" and the "court"; but that distinction has been abrogated by the present jury law.—*Odom v. State,* 1 Ala. App. 68, 55 South. 546.

(6) Two or three of the jurors, upon their voir dire, stated at first that they had a fixed opinion as to the guilt or innocence of the defendant which would bias them in their verdict. Upon further examination by the trial judge they stated, in substance, that they could go in the jury box and try the case solely upon the evidence. Thereupon the trial judge pronounced them to be competent to serve as jurors and had their names placed upon the lists from which the jury was to be drawn—and from which the jury was actually drawn —to try the defendant. There was no error in the ruling of the trial court.—*Long v. State,* 86 Ala. 40, 5 South. 443; *Pope v. State,* 74 Ala. 63, 57 South. 245.

(7) There was, of course, no error in the court's excluding from the jury in this case those who, upon their voir dire, stated that they had a fixed opinion against capital punishment.

(8) A citizen of this country is one who, by virtue of his birth, is a citizen, or one who, being born an alien, has complied with the laws of the United States with reference to the naturalization of aliens. Until an alien has fully complied with the naturalization laws of the

[Godau v. The State.]

United States and has been legally declared to be a citizen of the United States, he is, without regard to the length of his residence, an alien. Only citizens are qualified to serve as jurors in this state, and the trial court properly held that Lester Bodden, a British subject, was not competent to serve as a juror on the defandant's jury.

(9) One "A. Bombay" was called as one of the jurors. One "A. Bomboy" appeared in answer to that name. The juror stated that he was known as well by the name of "Bombay" as by that of "Bomboy," but that his real name was "Bomboy." The court held that the error in the name could not avail the defendant, and that, being qualified in every. other way to serve as a juror, he was competent to serve as a juror in the case. In this ruling the trial court was free from error. This juror simply had two names by which he was well known in his community, either of which names, according to his evidence, fixed his identity. The right *individual* was served and was placed upon the defendant as a juror.

(10) Whether or not a confession was or was not voluntarily made is, at all times, a question for the trial judge. No confession or admission of guilt should be allowed unless it appears, either from the surrounding circumstances or from positive evidence, that the confession was freely and voluntarily made. Confessions are prima facie involuntary, and there must therefore be evidence addressed to the trial judge (unless the circumstances attending the. confession show that it was voluntary) rebutting that presumption and showing, prima facie, that the confession was voluntarily made.

In the present case the trial judge had evidence tending to show that Mrs. Godau voluntarily and with-

out hope of reward appeared as a witness before the coroner's jury and there testified as a witness. Her testimony so given was therefore properly admitted, and its value as testimony was for the jury. The jury, of course, in determining the weight to be given to her testimony delivered before the coroner, had a right to look at all the evidence which had been given before the trial judge on the question as to whether or not it prima facie appeared that she was a voluntary witness before the coroner, and also the circumstances surrounding the defendant when she testified before the coroner as a witness.

(11) One Leon Godau Wasserleben, evidently a child of tender years, was sworn as a witness. The question as to whether a child of tender age possesses sufficient intelligence and sufficiently appreciates the nature and sanctity of an oath to testify as a witness in a case is a matter which is necessarily lodged largely in the discretion of the trial judge. While the questions propounded to the child and his answers to such questions, on his voir dire, can be committed to writing and transmitted in a bill of exceptions to an appellate court, the manner and appearance of the child while being examined—potential evidence for the cosideration of the trial judge—cannot be brought to the attention of an appellate tribunal. This child testified, among other things, that he knew that he would have to tell the truth after being sworn; that God made him; that God is a spirit; that bad people, when they died, went to a place of punishment and good people to a place of rest; that he had been to Sunday school; and that, while he could not explain what it was, he also knew what the Bible was. While there was evidence, as we have already stated, that he was a child of tender years and of immature intelligence, we do not think that

we are authorized to say, affirmatively, after a careful examination of this record, that the trial judge committed error in permitting Leon Godau Wasserleben to testify as a witness.—*Wade v. State,* 50 Ala. 164.

(12) The court fixed the defendant's venire at 100. Out of this number less than 20 qualified jurors appeared, and the court, proceeding under section 32 of the Jury Law (Pamp. Gen. & Local Acts 1909, p. 305), drew from the jury box enough qualified jurors *living within the corporate limits* of the city of Mobile to make the number 32. As the city of Mobile is a city of more than 10,000 inhabitants, the trial judge properly confined the drawing to complete the jury to the qualified jurors residing within the corporate limits of the city of Mobile as required by the above section of the above-cited act.

(13) A stenographer took the testimony of the defendant before the coroner down in shorthand, and made a stenographic transcript from his notes. Against the objection of the defendant the stenographer was permitted to read the stenographic transcript to the jury. The stenographer testified that he correctly took down, in shorthand, the evidence of the defendant as she gave it in to the coroner, and that the transcript which he read to the jury was a correct transcript made by him from his notes in shorthand. The act of a stenographer in taking down testimony in shorthand and then in truly and correctly transcribing the notes of the testimony so taken into longhand so that the average layman can read the testimony may well be regarded as one continuous transaction, and the stenographic transcript thus made may well be treated as the original. Of course, if it is desired to impeach the correctness of the stenographic transcript, the original notes can be required to be produced and a comparison

can be made. There was no error in this ruling of the court.

(14) In this case the trial court gave to the jury, at the written request of the defendant, 39 written charges. We have carefully read the evidence in this case, and we have carefully read the given charges. The written charges which were given by the court to the jury placed the law as applied to the evidence in this case as favorably to the defendant as the defendant had a right to ask. This is not only true, but these charges covered every phase of the testimony and fully informed the jury on all subjects which were of interest to the defendant. The court refused a number of charges which the defendant in writing requested it to give to the jury. The refused charges which, as applied to the evidence, stated correct propositions of law, were covered by written charges which the court, at the written request of the defendant, gave to the jury. The other "refused" charges were either abstract or were patently bad, and we will not discuss them.

(15) We have above discussed the important matters presented by this record. Counsel for defendant have filed with us an able brief, and in the above opinion we have discussed many, but not all, of the questions which, in their brief, they presented to us. We have felt that this is an important case to both the state and the defendant, and we have given to it much time and consideration. After carefully reviewing the entire record, we feel that, under the law, the judgment of the court below should be affirmed.

Affirmed.

DOWDELL, C. J., and ANDERSON and MAYFIELD, JJ., concur.