82 So.2d 406

**Albert Sidney DENTON**

v.

**STATE of Alabama.**

1. Div. 613.

Supreme Court of Alabama.

Sept. 15, 1955.

Albert Boutwell, Birmingham, and Geo. C. Hawkins, Gadsden, for appellant.

John Patterson, Atty. Gen., and J. Noel Baker, Asst. Atty. Gen., for the State.

MERRILL, Justice.

Albert Sidney Denton was tried and found guilty in Baldwin County under an indictment for murder in the first degree which charged that he killed Leroy E. Miller by shooting him with a pistol. He was found guilty and sentenced to life imprisonment in the penitentiary and from the judgment imposing that sentence, he appeals.

After the introduction of numerous witnesses, the state rested, and defendant moved to exclude all the evidence on the grounds that the state had failed to establish venue, had failed to show that the court had jurisdiction or had failed to show where the offense occurred. The motion was denied and this action by the trial court is the basis of the argument made in brief by appellant in this court.

The case of Britton v. State, 15 Ala.App. 584, 74 So. 721, 722, is directly in point; there the court said:

"After the prosecution had offered the evidence in chief and rested, the defendant made a motion to exclude the evidence on the ground, among others, that the venue had not been proven. This motion was appropriate and timely and presents the question sought to be raised. Taylor v. State, [15 Ala.App. 72] 72 So. 557; Randolph v. State, 100 Ala. 139, 14 So. 792.

"Proof of venue is jurisdictional and without such proof a conviction cannot be sustained. Code 1907, § 7140; Randolph v. State, supra. While proof of venue is essential to a conviction, it, like any other fact in the case, may be established by circumstantial evidence; and when the state offers evidence tending to show that the crime was committed within the jurisdiction of the court, the question becomes one for the jury. Pounds v. State, [15 Ala.App. 223] 73 So. 127; Powell v. State, 5 Ala.App. 75, 59 So. 530.

"And, though it be conceded that no such evidence was offered by the prosecution in chief, and that the motion was erroneously overruled, injury resulting therefrom was averted by the evidence subsequently offered. * *."

■ In citing the Britton case, supra, we do not agree with the sentence therein, "Proof of venue is jurisdictional and without such proof a conviction cannot be sustained." Long before the adoption of Circuit Court Rule 35 on June 23, 1913, 175 Ala. XXI, this court had held that failure to prove venue was not reversible error where no charge based on the sufficiency of the evidence was requested or given. In Hubbard v. State, 1882, 72 Ala. 164, this court speaking through Chief Justice Brickell said:

"* * * If there had been an instruction given or refused, involving an inquiry into the sufficiency of the evidence to authorize a conviction, the omission of evidence of the venue would have compelled a reversal of the judgment of conviction, in obedience to the authorities we have cited. But no such instruction having been given or refused, this court can not now interfere. It does not lie within our province to grant new trials, in cases civil or criminal, because the verdict and judgment may not appear affirmatively to be supported by the evidence."

Also, this court said in Watts v. State, 1920, 204 Ala. 372, 86 So. 70:

"The defendant was convicted of murder in the first degree, and the death penalty was imposed.

"The question of the sufficiency of the evidence showing the venue of the

crime to have been in Chambers county was not raised by appropriate instruction, requested or given, to the jury. When no instruction is given or refused, involving an inquiry into the sufficiency of the evidence to authorize a conviction, or as to the proof of venue, the failure of the bill of exceptions to show the venue was proved, while it sets out substantially all the evidence, will not work a reversal of the judgment; no compliance with circuit court rule 35 (175 Ala. xxi) being shown. Woodson v. State, 170 Ala. 87, 54 So. 191; Dentler v. State, 112 Ala. 70, 75, 20 So. 592; Hubbard v. State, 72 Ala. 164, 169; Justice v. State, 99 Ala. 180, 13 So. 658; Johnson v. State, 100 Ala. 55, 14 So. 627; Bowdon v. State, 91 Ala. 61, 8 So. 694; Ex parte Knight, 61 Ala. 482."

State's witness Jones had testified that defendant told him in Jacksonville, Florida, after the remains of deceased's body had been discovered in Mobile County: "You remember my former buddy Hardin? I bumped off one of his friends for him in Bay Minette—near Bay Minette."

■■ Moreover, defense witness Heflin testified on direct, that he was present when Miller had been killed at a private airport in Baldwin County and the following is from his cross-examination:

"Q. You tell the jury that Lee Miller was shot to death at Oaks Airport in Baldwin County?

"A. Yes, sir."

These facts and other inferences from the state's evidence made the question of venue one for the jury, and bring this case squarely in line with the rule of the Britton case, supra. Furthermore, there was ample evidence from which the jury could find beyond a reasonable doubt that there was a conspiracy to murder Miller and that part if not all of the acts constituting the offense occurred in Baldwin County even though the skeleton and clothing of deceased were found in Mobile County. Section 94, Title 15, Code of 1940 provides:

"When an offense is committed partly in one county and partly in another, or the acts, or effects thereof, constituting, or requisite to the consummation of the offense occur in two or more counties, the jurisdiction is in either county."

The trial judge charged the jury as to the question of venue including the effect of § 94, supra.

■■ Prior to the taking of testimony, appellant moved for a change of venue. The bases for the motion were five affidavits that due to the unusual amount of newspaper publicity which pictured Denton as a gangster who had been connected with dangerous and notorious criminals, Denton could not receive a fair and impartial trial in Baldwin County; and that the chief topic of conversation in the county was that Denton would be tried on March 25, 1954. Four newspaper articles were attached to the motion as exhibits.

The following extracts from Campbell v. State, 257 Ala. 322, 58 So.2d 623, 625, are dispositive of this question:

"II. There was no error in overruling the motion for change of venue. The defendant on such a motion has the burden of showing to the reasonable satisfaction of the court that a fair and impartial trial cannot be had and an unbiased verdict cannot reasonably be expected. Godau v. State, 179 Ala. 27, 60 So. 908; Patton v. State, 246 Ala. 639, 21 So.2d 844. * *

* * * * * *
" * * * In Godau v. State, 179 Ala. 27, 60 So. 908, 910, it was said:

" 'So long as we have newspapers we may expect to have through them the report of crimes, and it is not to be unexpected that, when a homicide is committed * * * the newspapers of the community, answering the public interest, will furnish the defendant with at least some material upon which to base an application similar to the one under discussion.'

\* \* \* \* \* \*

"The mere belief of the defendant or of his witnesses that he cannot receive an impartial trial is not sufficient to entitle him to a change of venue. Patton v. State, supra; Lee v. State, 246 Ala. 343, 20 So.2d 471, certiorari denied 325 U.S. 888, 65 S.Ct. 1576, 89 L.Ed. 2002."

The motion for a change of venue was properly denied.

 Among the grounds in the motion for a new trial were that the verdict was contrary to the evidence, the weight of the great preponderance of the evidence and that the defendant was entitled to the affirmative charge with hypothesis.

The record in this case unfolds a bizarre story. The deceased, Leroy Miller, a former Wyoming cowboy, operated the Lyn-Mar Fishing Lodge on Bon Secour River near Gulf Shores with his wife. He appeared to be a man of considerable means, owning a yacht, an airplane and several large automobiles. Miller and Nelson K. Hamilton, a Foley photographer, were partners in a gold-mining business in Mexico. They were both in Mexico from April to August 1952 and met the defendant Denton there in June. Denton was using the alias of Jimmy Montgomery. He returned to Mexico in July with Lurton L. Heflin and the two spent about ten days there. In early August Miller was shot in the arm and a bone was broken, necessitating the wearing of a cast. On August 15th, around noon, Miller and Hamilton arrived back in Foley. About 5:30 that afternoon and again about 9:00 o'clock that night, Miller received telephone calls at his home. It later developed that Heflin made these calls and made arrangements to pick up Miller later that night. At 6:00 o'clock, Miller's wife, Thompson and his wife and two other couples left to go to the dog races at Pensacola. Sometime after 9:00, Miller's daughter, her husband and Miller's mother and stepfather, saw a large black automobile drive up, heard Miller exchange greetings with the occupants of the car, saw him get in and leave. They never saw him again. It appears that six weeks later Miller's wife reported his disappearance to a city detective of Mobile and reported it to the Sheriff of Baldwin County four months after August 15th.

On February 17, 1953, one James Tait, while rabbit hunting, discovered a human skeleton by an old field road near St. Elmo in Mobile County. He reported this to the authorities and it was established by means of the clothing, the wired and broken arm bone, the cast and the teeth that the remains were those of Miller. Between the top and bottom layers of his rotting shirt were found a .38 and a .32 caliber pistol bullet.

It was known that Denton and Heflin had been at Gulf Shores on August 15, 1952 and had packed an automobile and left on August 17 (two witnesses so testified at the trial) and they were wanted for questioning concerning Miller's disappearance and death. On July 9, 1953, Denton was arrested in Gadsden and in a brief case in his car were two pistols,—.38 specials. On July 13th he told two FBI Agents and the Sheriff of Baldwin County that he had had the pistols in his possession "since he bought them new or that he knew where they were at all times." In response to a question asked as to whether he was worried about the charge against him in Bay Minette in connection with the death of Miller, he said that he was not worried because he had been informed that the guns were manufactured after the date of the alleged offense. But a ballistics test revealed that one of his pistols fired the .38 bullet that was found between the two layers of Miller's decomposed shirt.

One of the state's witnesses was a federal convict, Cletus Goldman, who had been convicted of "transporting interstate gems" and "armed robbery." A reasonable inference from his testimony is that he, his brother Myron, Denton, Heflin and one Hornbeck were members of the same gang. [At the time of the trial his brother Myron had been slain in a gun battle in Jacksonville, Florida, and Hornbeck was facing a death sentence in that state as the result of the slaying of a policeman in the same gun battle in which Myron Goldman was killed.

Hornbeck v. State, Fla., 77 So.2d 876.] He testified that he and the other four named were together in Savannah, Georgia, during the first ten days in February 1953 at the home of one Brewer, and that Hornbeck told them, in the presence of Denton, that Miller's wife had Howard Hardin, who operated the Canal Cafe at Gulf Shores, to hire Denton, Heflin and Hornbeck to kill Miller. He testified (quoting Hornbeck):

> "He and Denton and Heflin was supposed to have killed Leroy Miller for Howard Hardin and his wife for his insurance and property, and that they had followed him into Mexico and had been paid all expenses all along this route, and following their failure to kill him as they had told Hardin they would do, Hornbeck appeared on the scene and took charge and shortly after that the three of them killed him. Hornbeck reminded Heflin and Denton that all that it took to kill a man was to pull out a pistol and shoot him, and he said prior to that that there was some concern by Heflin as to an associate of Denton's in a car-theft gang in Jacksonville; that he was afraid that Denton would get drunk some night and reveal this murder. * * *."

He said Hornbeck further stated that, "We shot him eleven times" and "we all put lead in him" and that they had to burn the car because there was blood in it from transporting Miller's body, but Denton had received more money than either of the other two for the killing.

Another witness for the state, Thomas C. Jones, a federal prisoner, serving his third term for stealing automobiles, testified that he had known Denton while they were serving a term together in the penitentiary and after they got out Denton was trying to get the witness to go into a venture with him and that in January 1953 in Jacksonville, "Mr. Denton told him that he had previously,—before I got out of the pen—done enough to get himself in the electric chair if he got caught; he said: 'You remember my friend, Howard Hard-

in—my former partner in Atlanta' and I said 'yes' and he said, 'I took care of one of his friends in Bay Minette and have already bumped him off.'"

Denton did not take the stand in his own defense, but one of his witnesses was Lurton Heflin, a convicted bank robber. Heflin testified that he and Denton saw and talked with Miller in Mexico, that he made the two telephone calls to Miller the night he was killed, calling from Mobile; that he, one Nick Montos and a man named "Alex" picked Miller up in a black Lincoln; that they rode around a while, drank a couple of pints of whiskey, took Miller back near his home about one A. M. with arrangements to meet him at three A. M. at a private airport between Foley and Gulf Shores. He testified that he had $50,000 of Montos' money to pay for dope that was being flown in, but that Miller told them that the plane would be carrying $300,000 worth. "So we came to the agreement to give Lee (Miller) $50,000, and take the dope and have it weighed and analyzed and give him the balance." At 3 A. M. he, Montos and "Alex" arrived at the airport and met Miller, Nelson Hamilton and three other fellows, one of whom they called "John".

"Then there was a plane coming over and I heard Nelson Hamilton tell Lee to give the signal and they continued to argue and the plane went on by and it circled two times and he said: 'All right, give the signal, give him the signal' and evidently Lee gave the wrong signal, because I heard some shots—two different blasts, about four shots each, and naturally the rest of us ran up there and Hamilton had a gun in his hand and I asked what the deal was and so they—I didn't want to get involved in something like that, and he said that Hamilton said that Lee was trying to mess him around, so I left."

He also testified that Denton was not present at the killing.

It can be seen that the evidence was conflicting but there was ample evidence to support the verdict of the jury. The motion for a new trial was properly overruled.

"In accordance with our duty in criminal cases, we have examined the record for any error, whether pressed upon our attention or not. We have considered additional rulings on evidence, the oral charge and rulings of the court on refused written charges. The record is free from reversible error and is due to be, and is, affirmed." McCall v. State, 262 Ala. 414, 79 So.2d 51, 53.

Affirmed.

LIVINGSTON, C. J., and LAWSON and STAKELY, JJ., concur.