309 So.2d 835

**Bruce BOTSFORD, alias**

**v.**

**STATE.**

**7 Div. 309.**

Court of Criminal Appeals of Alabama.

Nov. 26, 1974.

Rehearing Denied Jan. 21, 1975.

Crowder & Espy, P. A., Tuscaloosa, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and Roger M. Monroe, Sp. Asst. Atty. Gen., Birmingham, for the State.

**484**

DeCARLO, Judge.

Bruce Botsford was indicted for first degree murder, and after a trial, was convicted of second degree murder with punishment fixed at thirty years.

The evidence presented at trial showed that the body of Rev. Edward Pace was found just inside his front door about 8:00 P.M. on November 26, 1973. His death resulted from gunshot wounds to the chest.

State's witness, Charles Ronald Battles, testified that he was with Gene and Phillip Arledge at the Ku Klux Klan hall on November 26, 1973, when appellant and Rickey Arledge arrived. Later, while standing in front of the Klan hall, he witnessed appellant and Rickey drive up to Rev. Pace's house and shoot him.

The shots were heard by Phillip Ramsey, who worked at the Dairy Queen across from the Pace residence. Appearing as a defense witness, he stated that upon looking out of the window, he saw a white car parked in front of the house with a man at the wheel. He observed another man enter on the passenger's side, and stated it was not the appellant. He described the driver as having an afro hairdo, and in his judgment, both men were black.

Along with the foregoing evidence, the state offered this confession made by the appellant while in custody:

"Date December 3rd, 1973

"STATEMENT OF: Bruce Wheeler Botsford, WM, age 22
3322 Stonewall Avenue
Gadsden, Alabama

"My name is Bruce Botsford, I am 22 years of age, I live at 3322 Stonewall Avenue in Gadsden, Alabama. I have had my rights explained to me, and I do understand my rights that I do not have to make any statements and that I have the right to remain silent, that anything that I say can be used against me in a court of law, that I have the right to talk to a lawer [sic] for advice before any questions are ask me, and to have him with me before any questions are ask me. I therefore do not want a lawer [sic] present and I also understand that I can stop at any time during the questioning until I talk to a lawer [sic]. I have had my rights explained to me and I am willing to make this statement and answer questions, I know what I am doing, no promises or threats have been made to me and no pressure or coercion of any kind has been used against me. Monday morning, November 26th, 1973 everybody was told to meet at the Klavern on Stroud Avenue in East Gadsden, Alabama at approximately 5:30 p. m. We all got there, well I went and got Rickey Arledge at the Base at Ft. McClellan to inform him of the meeting, as soon as Rickey got free from work, we went together to the Klavern on Stroud Avenue in East Gadsden, Alabama, It's right across the street from the Dairy King. When we got there we were told by Gene Arledge that we were going to burn this man's house, the late Rev. Pace which we didn't know at the time. It turned out that we could not burn it, so I won't swear to it but I believe it was Gene Arledge that said to just go right on over there and just go right in and get them. So Rickey Arledge said that he would back

me up if I would go. We got into Gene Arledges' Beige Plymouth, both Rickey Arledge and I had a Carbine .30 calibre, [sic] and I was carrying a Rossi .38 Calibre [sic] pistol snub nose, which belonged to Gene Arledge. I was standing in front of the Klavern and Gene Arledge handed me the .38 Calibre [sic] Rossi Pistol. The carbine that I also had, belonged to Rickey Arledge. It was in the car at the time that Gene Arledge gave me his pistol,. Well, we got into the car and drove over to the street beside the building and there were some people standing there behind a building so we pulled up in front of Rev. Pace's house and backed into his front yard leaving our headlights on facing East Broad Street. I was the driver of Gene Arledges' car and Rickey Arledge was in the front seat with me, we both got out of the car, we each were carrying a .30 calibre [sic] carbine rifle, and I also had a .38 calibre Rossi in a sholder [sic] holster. Rickey Arledge and I went up on the front porch, and I believe I knocked on the front door, when Rev. Pace come to the front door, when Rev. Pace come to the front door, we both opened fire with the carbine rifles, the door swung open and I could not see anybody else there so we both ran back to the car and I was driving at the time I noticed my pistol missing we proceeded towards Anniston, we went and picked up Rickey Arledges' girlfriend and went back to Rickey Arledges' trailer, I took Rickey Arledges Fait and one .30 Calibre Carbine that Rickey Arledge used in the shooting and headed back to Gadsden, Alabama. I went directly back to Gene Arledges' house, got out of the car and give the carbine to James Ray Johnson while we were standing in the front yard. James Ray Johnson said he would hide the gun so I stayed and talked with Gene Arledge who come out of the house after I got there. Gene Arledge asked me where I was going and I said back to Anniston. I went back directly to Rickey Arledges' trailer and we were going to dispose of the second .30 calibre carbine rifle and Rickey Arledge didn't want to just destroy it, so Rickey Arledge wrapped it in plastic and placed it under the brick steps to his trailer, it is actually slid up against inside the concrete block steps where I saw him hide it. We took Mary-? who is a WAC at Ft. McClellan home, who knows nothing about what is going on. We then both went to bed then and the next morning November 27th, 1973 on Tuesday, we got up and went to Rickey Arledges' Grand Fathers House in Greasy Cove, Alabama. We spent all day there leaving about two thirty or three o'Clock P.M., We went from there to Gene Arledges' house at 3322 Stonewall Avenue in Gadsden, Alabama. I picked up what clothes we had there that were clean and went back to the trailer near Anniston. We did not know at the time that we had killed Rev. Pace, but I do know that we shot him. I think I shot the carbine I had 3 or 4 time, I could not swear to it. I just know we fired several times and Rickey was standing to my left rear firing his weapon. This shooting happened so fast that if I could just go back to the house I could tell who shot where into the door. Any fired shoots to the LEFT of the house is the ones I fired, and those to the RIGHT angle are those shots Rickey Arledge fired. (see attached sketch of automobile and house of Rev. Pace that I sketched for Assistant Chief of Police Gerald Diggs, Captain James A. Davis, and Investigator J. D. Longshore) The fact is that when we went into this darn thing I did not know that it was a Minister. Gene Arledge had led us to be-

lieve that this was a Surveillance point on the Klavern, indicating the Black Panthers and that there would be weapons present. I had no idea that this was a preacher, when we went in there we expected to find armed people, that is why we were so cautious, oh' yes, one other thing, I was led to believe by Gene Arledge that this shooting was santioned by the UNITED KLANS OF AMERICA, but afterwards learned it was santioned by only Gene Arledge himself. James Ray Johnson was very mad that this shooting happened when he found out about it this same night. Rickey Arledge said that it would be best if I left and I had met a Fred Jones with Gene Arledge once before in Ft. Walton Beach, Florida about a month and a half ago, and I done a little commerical [sic] fishing and I figured I could get a job down there. So I borrowed Rickey Arledges' motocycle [sic] and $10.00 and started to leave for East Pass Marina in Florida, I believe it is in Destine [sic] Florida. This was the night that the storm hit (on Tuesday) and I couldn't get out of Gadsden. I had started back to Gadsden on the motorcycle and it rained to hard for me to leave, so when the rain actually hit I was close to another Klansmans' house so I went there and told him I was rained in and needed a place to stay the' rest of the night. This was Rex Johnsons' house near Agricola Shopping Center. Rex Johnson told me I could spend the night there and as far as I know he knew nothing about the shooting in any way and was not involved in it in any way. As far as Rex knew I was just rained in and couldn't get anywhere. I spent the night with Rex Johnson and got my clothes dried out and left there about 12:30 the next day on Wednesday November 28th 1973 headed for Ft. Walton Beach Florida. I arrived there in Ft. Walton just after dark, I called Fred Jones and told him that I needed a place to stay and a job and that I was a fried [sic] of Gene Arledge. He gave me Jeff Faulkners telephone number, I had met him previously, he (Fred Jones) had given me the wrong telephone number and I couldn't get a hold of him, So I spent the night right there in a shed at the edge of the Marinia. The next morning Fred Jones came to the Marinia [sic] and I asked him if he could find me a job and a place to stay-? He said that he was going fishing, that I could work with him, so we spent Thursday the 29th of November 1973, Friday the 30th of November 1973 and Saturday December 1st 1973 fishing. On Sunday morning I was arrested.

"I swear that the above statements made by me is [sic] correct and true to the best of my knowledge. I have made these statements of my own free-will and accord without threats or promise of reward to me in any way.

"/s/ Bruce Wheeler Botsford

"WITNESSES:
Gerald Diggs
Don Longshore
James A. Davis"

Prior to trial, appellant sought to have the confession suppressed. He did not deny making and signing it, but challenged that he did so voluntarily. Appellant insisted that he was "forced to endure some seven and one-half hours of intensive in-

terrogation by three law enforcement officers in the cramped quarters of an automobile." He also complained that he requested a lawyer repeatedly, and although the requests were not refused, they were evaded. Prior to making the statement, he said he was confronted on two occasions with the co-defendant and when he continued to resist, Captain Davis threatened to "put him in a bullpen full of niggers and let them talk it out of him."

At a hearing conducted outside the jury's presence, this testimony was given:

Captain James A. Davis of the Alabama Department of Public Safety, Etowah County Deputy Don Longshore, and Assistant Chief Gerald Diggs of the Gadsden Police Department arrested appellant in Crestview, Florida, on December 2, 1973, about 6:30 P.M. A Waiver of Counsel form used to advise Botsford of his "Miranda rights" was read and signed by appellant. Above his signature on the form, appellant wrote: "I Bruce W. Botsford did finish high school in W. Palm Beach, Fla."

During the return trip, appellant told the officers if Rickey Arledge had given a statement, then he would decide whether or not to give one after they reached Gadsden. The state maintained appellant at no time said he wanted to talk to a lawyer.

Captain Davis explained they returned to Gadsden by a longer route for these reasons: First, they were travelling on Sunday in a trooper car, and it would be easier to get gasoline at trooper stations in Evergreen and Montgomery; and second, they had received information that an attempt might be made to take appellant.

When they stopped in Montgomery to eat, appellant's handcuffs were removed, and Captain Davis did not recall whether they were used afterwards.

During cross-examination by both defense attorneys, Captain Davis denied threatening the appellant and repeated that Botsford made and signed the statement voluntarily after he heard Rickey Arledge's statement read.

Gerald Diggs testified that they returned to Gadsden about 1:30 or 2:00 A.M., and this portion of his testimony shows the circumstances surrounding the taking of appellant's statement:

". . . [W]e had him in the detective's squad room. And he said that he wasn't going to make a statement unless Rickey was brought down from the jail. And if Rickey would say that he made the statement, then, he would make one. So, we brought Rickey in. Rickey says, 'Yes, I made the statement.' And Rickey was taken out of the detective's squad room and Bruce Botsford was asked if he would then make a statement and he said, 'I am not quite satisfied yet.' And then, I asked him what he meant by that and he said, 'Well, if you will read his statement in my presence and if Rickey says to me that he made that statement and signed it, then, I will give you a statement.' So, Rickey Arledge was brought back into the detective's squad room. I read the statement. Bruce asked—Bruce Botsford asked Rickey Arledge says, 'Is that true? Did you sign that?' Rickey said, 'Yes.' Bruce Botsford got up and shook my hand and said, 'That is a good job.' Said, 'Get your pencil out.' "

Further, Diggs said he typed the statement as Botsford narrated his participation, and it was signed about 4:00 A.M.

Appellant's testimony was in direct conflict with that of the arresting officers, but he admitted drawing a diagram of the scene after he signed the statement. This diagram showed it was signed by appellant at 3:30 A.M. on December 3, 1973. At the conclusion of the hearing, the judge resolved the credibility problem in favor of the police and ruled the confession was voluntary and admissible.

## I.

Appellant now raises the contention that the confession was involuntary and improperly admitted into evidence.

■ The matter of admissibility of a confession in the first instance is addressed to the trial judge. Its weight and credence are addressed to the jury. Edgil v. State, 36 Ala.App. 379, 56 So.2d 677; Burns v. State, 226 Ala. 117, 145 So. 436.

■ Our court recognized in McNair v. State, 50 Ala.App. 465, 280 So.2d 171, that:

". . . [I]t is not unusual for the voluntariness inquiry to present conflicting evidence. Edgil v. State, 36 Ala.App. 379, 56 So.2d 677. When such a conflict occurs and the trial judge finds that the confession was voluntarily made, great weight must be given to his judgment. This finding will not be disturbed on appeal unless the appellate court is convinced that the conclusion is palpably contrary to the weight of the evidence. Emerson v. State, [281 Ala. 29, 198 So. 2d 613] *supra*; Harris v. State, 280 Ala. 468, 195 So.2d 521; Edgil v. State, *supra*. Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not to a moral certainty. Minirth v. State, 40 Ala.App. 527, 117 So.2d 355, cert. denied, 270 Ala. 228, 117 So.2d 360."

■ Attorneys for appellant cross-examined the officers on voir dire out of the jury's presence, and in court with the jury present, on all the questions pertaining to voluntariness, including the Miranda warnings and waiver of counsel. The appellant testified on voir dire, out of the presence of the jury, that he had been coerced, threatened, intimidated, and denied the right to counsel. He testified before the jury, by stipulation, for the same limited purpose. We believe that the testimony was sufficient for the trial court to make its initial finding that the confession was voluntary. This controversy was ultimately resolved by the jury in favor of the state, and under the foregoing facts, we are not persuaded that the verdict should be disturbed.

## II.

Appellant filed a motion for change of venue on the basis of excessive prejudicial news coverage, various incidents in the city, and the testimony of numerous witnesses. He now complains that the trial court erred in refusing to grant his motion.

We now consider the evidence before the lower court on this issue:

1. Testimony of eleven witnesses. (Six witnesses testified the appellant could not get a fair trial; three of the six also admitted knowing one of the persons charged in this offense. One witness testified that although she believed the defendant could not get a fair trial, she would, if called as a juror, try her best to give him a fair trial.)

2. Statements attributed to law enforcement officers indicating "they had a good case."

3. Testimony of the Superintendent of Gadsden City schools. (Because of disturbances the schools were closed for three days after the shooting.)

4. National television and radio coverage of the incident.

5. Twenty-two issues of the Gadsden Times which contained in excess of forty articles, editorials or letters to the editor relating to the death of the minister.

■ The objective, in the matter of a change of venue, is to insure a fair and

impartial trial as guaranteed by the Federal and State Constitutions.

█ If then, a petit jury, free from bias or prejudice, could *not* be found in Etowah County, appellant would be denied his Constitutional rights.

█ The existence of widespread publicity alone does not indicate that a defendant will not get a fair and impartial trial. Mathis v. State, 52 Ala.App. 668, 296 So.2d 755. Actual prejudice directed toward the accused resulting from extensive publicity must be shown. Godau v. State, 179 Ala. 27, 60 So. 908.

█ In the newspaper reports before us, we find continual reference to "suspects", "killers", and "white men" being sought in the death of the black minister. We find no suggestion that the appellant was prejudged or statements inciting an interference with the calm and orderly conduct of the trial. There is nothing in the reports or editorials to arouse bias or prejudice against the appellant personally. No evidence indicates radio and television coverage was of a different character.

The trial judge was in the best position to evaluate whether the conditions and sentiment caused a prejudicial atmosphere. Donald v. Matheny, 276 Ala. 52, 158 So.2d 909.

█ A decision on the motion to change venue is a matter for the sound discretion of the trial court, and in the absence of gross abuse, the decision will stand. Payne v. State, 48 Ala.App. 401, 265 So.2d 185.

From the evidence presented during the hearing, it was not shown that an impartial jury could not be selected, and denial of the motion was without error.

### III.

Appellant insists the court erred when it permitted the District Attorney to cross-examine him regarding the co-defendant's statement. It had been agreed that appellant's testimony before the jury would be limited to the issue of voluntariness. Prior to the examination of appellant, the trial judge admonished the jury on the purpose of his testimony.

During cross-examination before the jury, the appellant testified:

"Q. All right, they didn't have any pictures of those arrows and bullets, and so forth, did they?

"A. That description was very clearly stated in Rickey's statement.

"Q. Oh, you drew this from Rickey's statement?

"A. I put in that picture what I thought they wanted to see.

"Q. Uh, huh. Well, you just—did they tell you to draw a diagram, or did you suggest that you would draw a diagram to show them just like it happened?

"A. They told me.

"Q. They told you to draw a diagram?

"A. Yes, sir.

"Q. And you just put in the diagram what you thought they'd like to see.

"A. Yes, sir.

"Q. All right. And you got the angle of the bullets, and everything, from Rickey's statement, right?

"A. Yes, sir.

"Q. Rickey's statement says that you were shooting in one direction and he was shooting in another, is that right?

"A. Rickey's statement said that I believe one at each side of the door.

"Q. Rickey's statement said he didn't shoot any, did he?

"MR. CROWDER: We object to what Rickey's statement said.

"MR. THOMPSON: We object to that, Judge.

"ASSISTANT DISTRICT ATTORNEY MARTIN: Your Honor, he said he drew that from Rickey's statement.

"THE COURT: Yes, I think he opened it up. I will overrule it."

A further study of the record revealed this testimony by appellant on direct examination:

"Q. (By defense counsel) When you got back to Gadsden just tell the jury what happened after that.

"A. They brought me up to the detective's squad room which is in the same building with the Gadsden Jail. And they continued questioning me there. And after I had gotten there I asked them—I told them that I thought I ought to talk to a lawyer before I made any statement at all. And they just—they didn't say no, I couldn't have one, they just worked their way around it and acted like I didn't say it and kept asking questions. And I didn't give them a statement—*well, they brought in a statement saying that Rickey Arledge said that I did it*. And I told them that I didn't believe that and that I wanted Rickey—I wanted to see Rickey. And they brought Rickey in and he read me a statement and said that he wrote it. And I still told them I didn't want to make a statement. . . ." (Emphasis added)

▮▮▮▮ Appellant will not now be heard to complain. As shown from the direct examination, reference to Rickey's statement was already before the jury.

" 'It is a familiar rule that it is not error to allow the same facts to be again shown against objection when they have already been proven without objection.' "

Purser v. State, 39 Ala.App. 169, 96 So.2d 689.

No error appears in the record.

Affirmed.

All the Judges concur.

## ON REHEARING

DeCARLO, Judge.

It is appellant's position that certain details were omitted from the above opinion and should be included for a better understanding of the factual situation. Although it was our view that the weight and materiality of such items hardly justified their inclusion, in deference to appellant's request, we add the following:

En route from Crestview to Gadsden, Captain Davis had a tape recorder in the front seat of the car with a thirty minute tape on it. The recorder had been used by him in investigative work for six or seven months. On this particular occasion, however, he was unsuccessful in activating the machine and nothing was recorded. No one was present when he checked the recorder, and Davis stated no tape existed.

Appellant testified that an alleged statement by another suspect incriminating appellant was continually waved in his face throughout the return trip. Further, when appellant signed the diagram, he had no idea whether or not the notation "Dec. 3, 1973—3:30 A.M." was on it.

The Waiver of Counsel form was dated November 26, 1973, rather than December 2, 1973, when appellant was taken into custody. Captain Davis admitted this was a mistake. He informed the court the Waiver was actually signed on December 2, 1973, although he erroneously entered the date of the offense.

We adhere to our original decision. The foregoing testimony was thoroughly considered in our initial determination.

Opinion extended: application overruled.