191 So.2d 239

Harold LEE

v.

STATE.

4 Div. 573.

Court of Appeals of Alabama.

Oct. 11, 1966.

Harold Lee, pro se.

Richmond M. Flowers, Atty. Gen., and Jas. H. Evans, Asst. Atty. Gen., for the State.

CATES, Judge.

This appeal was submitted here August 18, 1966.

Lee was indicted (jointly with James. Lee) for first degree burglary for the breaking and entering, with intent to steal, of a dwelling house at night owned and occupied by Mrs. Carrie Hartley, lodged therein. Code 1940, T. 14, § 85; see form 29, T. 15, § 259. See Walker v. State, 63 Ala. 49, as to variance from Common Law in a statute preceding the 1935 Act which divided burglary into two distinct degrees.

Tried on a severance, the jury found Lee guilty and set his punishment at the statutory minimum, ten years in the penitentiary. The court then held allocutus. thereafter pronouncing judgment.

The minute entry of record following the "jury and verdict" entry reads:

"Thereupon, the Defendant, having been personally present in court during the entire trial, was asked by the Court if he had anything to say why the sentence of the law should not be pronounced upon him, and to which inquiry he said. nothing.

"The Court thereupon proceeded to pronounce judgment on him pursuant to the verdict of the jury and to sentence him. as follows: It is considered, ordered and adjudged by the Court that the said Harold Lee, be and he is hereby sentenced to imprisonment in the Penitentiary of Alabama for a term of ten.

(10) years, and it is further considered, ordered and adjudged by the Court that the State of Alabama have and recover of the defendant the cost of this cause for all of which let execution issue."

### I.

Mrs. Hartley testified that between 3:30 and 4:00 in the morning of November 6, 1965, Lee and another man came up on the front porch of her house. She had been called to the front of the house by her nephew.

She turned the porch light on after having opened the main door. Two men standing outside "jerked the [fastened] screen [door] down and shoved the [wooden main] door open before [she] could get it fastened, and they demanded the money." (R. 11—bracketed matter interpolated from other parts of the testimony.)

Mrs. Hartley handed about $75.00 to these intruders, one of whom she identified as Harold Lee.

Lee and his brother, James, were arrested and put in the Covington County jail. The brother was put upstairs in the bull pen. This seems to have been habited by inmates allowed certain privileges such as playing cards and checkers, and having a trusty run errands for soft drinks and cigarettes.

Lee was put downstairs in a cell by himself. He had none of the amenities enjoyed by the prisoners above. He stayed beneath six days.

Lee admitted that the sheriff had advised him that he did not have to say anything, that whatever he *said* could be used against him.[1] (R. 23.) On voir dire to determine the admissibility of the confession, Lee testified (with the jury excused) in part:

"Q You heard Deputy Berry testify about this statement that you purportedly made?

"A I did.

"Q Look at that right there. Is that it?

"A I did sign it, yes, sir.

"Q Did you write it out?

"A No, sir, I didn't.

"Q Who wrote it?

"A James Lee did.

"Q Now tell us the circumstances under which you signed it?

"A Well, I was sort of miserable down there in the hole by myself, and too, I got Mr. Ivey a little aggravated with me too, you know, and I wanted to be with somebody where I could talk because I was miserable, you know, and I was all messed up, you know, and too, I asked the Sheriff if I signed a statement on this would there be any chance of me getting out on bond where I could go see about it and see what all this junk is. He said, well, we'll go talk with the Judge about it. So I called him over there and I told him I was ready, and so they carried me upstairs. James didn't want to sign one, so they carried me upstairs and Ariel come on up there, and so James said you better sign this. I said I ain't signing nothing. I said I don't know how to go about it. He said I'll write it out and if you don't sign it they'll put you back downstairs, and I said, go ahead and write out whatever you want to, I'll sign it. I didn't want to be back down there. And so I kept waiting for them to come over and see Mr. Smith about getting the bond, you know, where I could get out and make some kind of arrangements. I wrote the Judge about getting to see him, and I don't know, I reckon he didn't see where it was necessary, so I never did get to see him.

"Q Now were you led to believe that your bond would be lowered or there would be an attempt to lower the amount of your bond?

---

1. As to counsel Lee testified that the sheriff could have told him.

"A  Yes, sir, that was what I was all the time hoping, you see, where I could go back to work and see could I get the thing settled some way, you know. It was sort of bad down there by myself.

"Q  How long had you been kept down there by yourself?

"A  Six days.

"Q  How were you treated down there?

"A  Well, I might have brought it on myself, I don't know. I couldn't get anything to smoke or either to drink, or I couldn't get to send to the store. Mr. Godwin was a little mad with me, which I might have brought on myself, I don't know.

"Q  You didn't have anything to smoke. What do you mean by drink?

"A  I wanted some soft drinks and the colored boy wouldn't bring them to me.

"Q  Did he bring them to you up in the bullpen?

"A  Yes, he did.

"Q  Did he bring you something to smoke up in the bullpen?

"A  Yes, he did.

"Q  And when you were down there by yourself they wouldn't do it?

"A  No, sir.

"Q  And James told you if you didn't sign it they were going to put you back down there?

"A  Yes, sir.

"Q  And you didn't write that out yourself?

"A  No, sir, I did not.

"Q  Can you read and write?

"A  Yes, sir.

"Q  Did you read what it said?

"A  No, sir, I didn't read it.

"Q  That's all.

"CROSS EXAMINATION

"BY MR. BROGDEN [District Attorney]:

"Q  Now when you signed that you were up in the bullpen, weren't you?

"A  Yes, that's right.

"Q  How long had you been up there?

"A  About five or ten minutes.

"Q  Who had let you go back to the bullpen?

"A  Mr. Berry or Mr. Gantt one, I couldn't tell you correctly.

"Q  They let you go back up there?

"A  Yes, sir.

"Q  And they didn't say anything to you at all about signing a statement, did they, Harold?

"A  Well, no. Mr. Gantt did say that he had to get a statement. He did say that.

"Q  But he didn't tell you what to write or what to sign or nothing about it, did he?

"A  No, he didn't.

"Q  He did not?

"A  He did not.

"Q  And you were in the bullpen and he had let you go to the bullpen?

"A  Yes, but, see, James wouldn't go along with it. So they just slammed the door and said we'll leave him down there awhile, and so in a few minutes they brought James up here, too, and James said you better sign this statement or you are going back down to the hole, and so I signed it.

"Q  But Mr. Gantt or anything [sic] of them didn't tell you that?

"A  Mr. Gantt did tell me that.

"Q He didn't tell you that you were going back down in the hole if you didn't sign the statement?

"A No. Mr. Ariel was standing over there. Well, correctly, I don't know what Ariel said. I remember Ariel saying something. Of course I didn't want to go back down there so I signed it.

"Q But they didn't tell you to sign anything, did they, Harold?

"A Yes, he told me that they had to have a statement.

"Q Did he tell you he would like to have a statement or he had to have one?

"A He said he had to have a statement on it.

"Q That he had to have a statement on it?

"A That he did.

"Q When did he tell you that?

"A He told me that several times.

"Q He told you that several times?

"A Well, let's say three times.

"Q But he never did set nothing down in writing and ask you to sign it, did he?

"A No.

"Q And he wasn't there in the bullpen when you signed this, was he?

"A No, he wasn't. Mr. Berry was standing there at the bars."—(R. pp. 19–22.)

Mr. Berry, a deputy sheriff, testified—with the jury withdrawn—in part:

"* * * I wasn't there when the statement was given. He wrote the statement out up in what we call the bullpen.

"Q In other words, you weren't even present when he wrote the statement?

"A No, sir.

"Q Did you know that he had this statement?

"A Yes, sir. He asked me for a piece of paper.

"Q He asked you for a piece of paper and you gave him the paper?

"A Yes, sir.

"Q And did you or anyone in your hearing or presence offer him any reward or hope of reward or threaten him in any way, or coerce him in any way to get him to make a statement?

"A If it was it had to be another prisoner because there was no officer there.

"Q Nobody was there when he wrote this out? There was no officer there when he wrote this out, is that correct?

"A No, sir."—(R. 18.)

On cross:

"BY MR. SIKES [Defense Counsel]:

"Q Now you said that they wrote out a statement, is that right?

"A Yes, sir.

"Q Did you see them write it out?

"A No, sir.

"Q Did they write out a joint statement or separate statements?

"A They had two separate statements.

"Q Now prior to this time Harold had been kept down by himself somewhere, hadn't he?

"A Yes, sir.

* * * * * *

"Q Did you ever tell him anything about a bond?

"A No, sir.

* * * * * *

"Q Did you tell him that if he didn't sign that statement that he would be put back down in that room by himself?

"A No, sir, I sure didn't.

* * * * * *

"Q And this is written out in his handwriting?

"A  I guess it is his handwriting, Mr. Sikes. I couldn't say about that. It was handed to me through the bars by him." —(R. pp. 18–19.)

The statement prepared by Lee's brother for his signature reads:

"I Harold Lee swears that myself and James A. Lee enter the house of Mrs. Carrie Hartly on the 6th of November and taken her money by force. This is a true statement,

"s/ Harold H. Lee

"WITNESS
"H. I. Godwin
"A. F. Berry"—(R. 35.)

On this exhibit coming into evidence, the State rested.

Lee took the stand as a witness in his own behalf. He testified in chief (in part):

"Q  You know Mrs. Hartley, don't you?

"A  Indeed I do.

"Q  You have known her a long time?

"A  Yes, sir. She has always been a very dear sweet woman.

"Q  Do you recall going to her house that night?

"A  I do not.

"Q  Have you ever discussed going to her house with anybody?

"A  No, sir. I didn't want to talk about it too much.

"Q  I mean before you were accused of this did you ever talk about going to her house with anybody?

"A  No, sir.

"Q  Did you ever go there with James Lee?

"A  No, sir. If I done it God have mercy on me because I don't remember it. I'll put my life in His hands, whatever He wants to do with it."—(R. 45.)

On cross his testimony went:

"BY MR. BROGDEN:

"Q  Harold, actually you are not denying doing this, are you?

"A  Well, I'm not saying that I did or didn't. I don't * * *

"Q  Well, previously you have told Mr. Gantt that you did it, didn't you? Haven't you told Mr. Gantt that?

"A  Have I told Mr. Gantt that I did it?

"Q  Uh huh.

"A  I said if Mrs. Hartley said I done it, I done it.

"Q  That's right.

"A  That's exactly right and I think he will tell you.

"Q  You wrote Judge Smith a letter and told him that you did it, didn't you? Do you remember writing Judge Smith?

"A  I don't remember where [sic] I said I done it or not. I said if she said I done it, she is a true Christian and everything and I would take her word for it.

"Q  In other words, you are just saying you don't remember?

"A  That's right. I never do anything like that, I don't think, because I didn't have no cause whatsoever to do it. I had money of my own and buying all the beer.

"Q  I believe that's all."—(R. 46.)

II.

In Malinski v. People of State of New York, 324 U.S. 401, 404, 65 S.Ct. 781, 783, 89 L.Ed. 1029, the majority opinion of Douglas, J., holds that if any involuntary confession "is introduced at the trial, the judgment of conviction will be set aside even though the evidence apart from the confession might have been sufficient to sustain the jury's verdict." Cited therefor is Lyons v. Oklahoma, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481.

The minority, too, cited the *Lyons* opinion. Now it would seem that the 1964 decision overruling Stein v. People of State of New York, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522, on New York practice, Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 detracts much of the force in the minority opinion in *Malinski*.

Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760, holds that the falsity vel non of a confession cannot expurgate coercion as a denial of due process.

However, we think the facts here are clearly distinguishable.

In Minirth v. State, 270 Ala. 228, 117 So.2d 360, though certiorari was denied, the reasoning of this court was amplified. The Supreme Court hypothesized that if Minirth had alone claimed that the still was his (and not Mig Mayner's) the State then would have to have established that Mayner exerted no undue influence on Minirth.

There, since Minirth's confessory statement incriminated both culprits, the failure to extend the predicatory examination to the absence of inducement by the accomplice, Mayner, was harmless error.

■ This principle applies here. The statement prepared by James Lee blamed him and the appellant. Had the appellant's claim of being willing to sign anything rung true, James could have left himself out of complicity.

The State points out in brief the defendant's own testimony quoted above is a quasi admission of his guilt. The Attorney General argues that should the confession be considered as having been insufficiently shown to be free from improper inducement, nevertheless Cornelison v. State, 279 Ala. 145, 182 So.2d 877, cures any such error. We do not apply that case to this record.

Since whatever persuasion James Lee used on appellant applied equally to James, we cannot consider it as venal or oppressive. Under *Minirth*, supra, we hold there was no error in the admission of the statement.

### III.

■ In addition to his plea of not guilty, Lee orally pled not guilty by reason of insanity. Code 1940, T. 15, § 422, thus required him to prove this defense clearly to the reasonable satisfaction of the jury.

There was some evidence of Lee indulging in temper tantrums when his father sent him out to fetch firewood. Another time he fought his brother on being refused $300 to buy a car.

Another witness related that he refused to sell appellant some beer. Lee "wanted to get rough with [witness] because" of this rebuff.

One of the jailers testified Lee caused him quite a bit of trouble during his sojourn. Lee tried to slash his wrist twice and once tried to hang himself with a belt.

■ The evidence of these failures is so sparse that we can no more evaluate them as suicidal attempts than as mere gestures simulating attempts. Hence, we cannot say the jury was wrong in its not bringing in a verdict of not guilty by reason of insanity.

### IV.

■ On his giving notice of appeal, the appellant filed a well composed and literate written notice. Among other things he stated:

"The appellant, Harold Lee, intelligently, and understandably, waives appointment of counsel to prosecute the said appeal, and desires to file and proceed pro se."

We consider this meets the requisites of Martin v. State, 277 Ala. 153, 167 So.2d 912, particularly since the court below granted his pauper's request for a free transcript.

The Attorney General aptly cites Boutwell v. State, 279 Ala. 176, 183 So.2d 774 (hn. 4) on this point.

### V.

We consider, after careful review of the entire record under Code 1940, T. 15, § 389, that the judgment below is due to be

Affirmed.