183 So.2d 774

**Grady Vance BOUTWELL, Jr.**

v.

**STATE of Alabama.**

**3 Div. 206.**

Supreme Court of Alabama.

March 3, 1966.

Rehearing Denied March 17, 1966.

Grady Vance Boutwell, Jr., pro se.

Richmond M. Flowers, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

PER CURIAM.

Appellant was indicted for murder in the first degree by a grand jury of Escambia County, Alabama. He was tried and convicted of murder in the second degree, from which judgment of conviction he appeals. The sentence was 30 years imprisonment in the penitentiary for the murder of Shirley Ann Mosley.

Defendant was an indigent and unable to employ counsel to represent him either at the preliminary, when he was bound over to the action of the grand jury, or when he was tried on a plea of not guilty in the nisi prius court. Prior to arraignment, the trial judge of the circuit court of Escambia County, where he was convicted, on petition of defendant for counsel appointed him an experienced and capable trial lawyer who performed the duties for which he was appointed. Defendant was also represented by appointed counsel at the preliminary trial.

Defendant's plea of not guilty to the charges embraced in the indictment was entered in the presence of defendant's counsel at the arraignment.

On the date of the arraignment, March 30, 1965, the defendant, through his attorney, filed a verified motion for a change of venue. He asserted that he could not get a fair trial in Escambia County on account of some alleged prevailing conditions. The petition was presented at the time without comment from defendant's counsel and overruled on that date. Counsel then indicated that he desired to be heard on the motion. The court thereupon set Friday, April 2, 1965, as the time and occasion to hear the motion.

Testimony on the motion was taken on that date. This testimony consisted mainly of the introduction of several newspapers published in Escambia County, and one in Florida adjoining said county. These newspapers, which are before us, gave publicity to the charge against defendant and statements that he had confessed to the murder. Also, some detective magazines, not published in Escambia County, but distributed therein, with details of the crime and the confession, were introduced. No oral testimony was taken by either side.

On motion of the State, the question vel non of a fair trial for defendant in Escambia County was passed for determination on voir dire examination of the special jury summoned to hear the evidence, if selected. Sections 63 and 64, Title 30, Code of 1940.

On voir dire, it appears that 35 jurors, in answer to the question, "Have you read any newspaper stories at any time about the death of Shirley Ann Mosley?" held up their hands which indicated that they had. No juror held up his hand in answer to the question, "Have you read any magazine stories at any time about the death of Shirley Ann Mosley?". In answer to the question, "Have you heard any radio broadcasts about the death of Shirley Ann Mosley?", no juror indicated that he had. On being asked if they subscribed to certain newspapers, the responses were as follows: The Brewton Standard, 9; Atmore Advance, 6; Esca Rose Journal, 1; Mobile Press, 25; Montgomery Advertiser, 9. In answer to the question if they had discussed the case with any one, there were no affirmative answers or signs. None indicated that he had expressed an opinion as to the guilt or innocence of the charge, no juror held up his hand. The court thereupon asked the jurors if they knew of any reason why they could not give the defendant a fair and impartial trial, taking into consideration the newspaper articles and the publicity given the case in Escambia County. No juror indicated that he had

been affected by the publicity or was biased by any of the news media. The court thereupon overruled the defendant's motion for a change of venue. Defendant excepted.

On motion for a change of venue (§ 267 et seq., Title 15, Code of 1940) in a criminal case, defendant has the burden of showing to the reasonable satisfaction of the trial court that a fair and impartial trial cannot be had and an unbiased verdict cannot reasonably be expected. Tiner v. State, 271 Ala. 254, 122 So.2d 738(2).

We quoted, with approval, in the *Tiner* case, supra, an observation of this court in Godau v. State, 179 Ala. 27, 36, 60 So. 908, as follows:

"So long as we have newspapers we may expect to have through them the report of crimes, and it is not to be unexpected that, when a homicide is committed and discovered under circumstances like the present—even if the defendant's account of the entire matter is the truth—the newspapers of the community, answering the public interest, will furnish the defendant with at least some material upon which to base an application similar to the one under discussion. * * *"

The foregoing applies also to radio and television news reporting. Tiner v. State, supra.

We do not discover from the newspapers and magazines offered in evidence any inflammatory statement, or other matter, on which we can base a conclusion that the appellant could not receive a fair and impartial trial in Escambia County. Tiner v. State, supra. The motion for a change of venue was overruled without error.

It appears from the evidence that the nude dead body of Shirley Ann Mosley, possibly 18 or 20 years of age, was discovered early in the morning of May 18, 1964, in Little Escambia Creek in Escambia County, Alabama. The point of discovery was between Pollard and Flomaton. The signs indicated that she had been dragged for twenty-five or thirty feet across a sand bar to the edge of the water and the body found lodgment in the bottom of the creek. The sheriff contacted a State Toxicologist, Dr. Nelson E. Grubbs, at Mobile, Alabama.

Dr. Grubbs, whose qualifications as a toxicologist were conceded by the defendant, testified for the State that on or about May 18, 1964, he performed an autopsy on the body of Miss Mosley at the funeral home in Flomaton, Alabama. He further testified the body revealed that she had a bruise over the right eye; there was an abrasion under her chin approximately an inch and one half by an inch long. There was an abrasion on the neck.

Also the witness testified that he performed an autopsy on the body of Miss Mosley; that he "opened * * * and examined" the body "from the pubic region to the neck, dissected the skin away from the neck around the skull and observed the findings therein." The autopsy also consisted "of an examination of the trachea, the esophagus, lungs, the heart, thorax area, stomach and other organs." Further he answered questions as follows:

"Q. Now I want to go back and ask you about the examination of the trachea and throat and just tell us what you found there please sir?

"A. I found at the base of the tongue at the top of the trachea or wind pipe, that it was crushed, hemorrhagic and bleeding, or leaking blood which had extended down into the trachea into the upper part of the lungs.

"Q. What does that examination there and your findings indicate to a person trained in the science of toxicology Mr. Grubbs?

"A. It indicates strangulation.

"Q. After an examination of this body there at that time, and based on the results of your knowledge and experience and upon your examination of this particular body, do you have an opinion as to the cause of death of this person?

"A. I do.

"Q. What is that opinion sir?

"A. Strangulation."

Further the witness testified that he made an examination of the automobile (shown to be that of defendant) and obtained hair and blood stains from the car. He examined the stains and hairs in his laboratory. He made a laboratory examination and comparison of these blood stains from the car with blood from Miss Mosley, but the identification was not conclusive. With reference to his study of the hair which he removed from the automobile with that removed from the dead body, he testified:

"Q. Now let me ask you sir—did you also conduct a study into the hair which was removed from the automobile and the hair which was removed from the dead body?

"A. I did.

"Q. Tell the petit jury how you go about doing that please sir?

"A. This is primarily a microscopic examination in which the hair is first examined miscroscopically in length and diameter by means of a comparison microscope in which you put the known hair—in this case, the hair I removed from the body, and the hair that was obtained from the car in my presence—under an adjoining part of the microscope and you examine two at the same time for similarity, then later you do a cross section to determine any further information that might be determined—in this case I did both and it was similar in all respects, but it was not positive identification. It was similar.

"Q. You say similar in all respects, are you referring to the texture, the diameter which of course can be measured under the equipment you have there, and the color as well?

"A. Yes sir.

"Q. What you are saying then is nobody could state positively that was hair from the same person, but it resembled it in every respect?

"A. Yes sir."

It appears from the record of the evidence of Sheriff G. S. Byrne, Jr., that on May 18, 1964, responding to a call about 6:10 A.M., he viewed the scene at the creek, between Pollard and Flomaton, where the nude body of Miss Mosley was discovered in the creek. He saw "where the body was drug [sic] and I walked down to the creek and saw the body then I came back to the car and called Mr. Taylor and told him to come down—him and Mr. Holmes—and then I went and called Nelson Grubbs." The body, as he testified, was taken to the funeral home at Flomaton. He identified the dead body as that of Shirley Ann Mosley. Also, he testified that the dragging signs from the edge of the water went back to where an automobile had been parked.

Witness further testified that he first saw the defendant, Grady Vance Boutwell, Jr., on the morning of May 18, 1964, in the South Flomaton (Florida) jail. He was in custody of the Florida officers on a charge of murder in the first degree. He had asked the Florida officers to procure a fugitive warrant.

On cross-examination, witness said that he first saw the defendant in the South Flomaton, Florida, police station; that he told him he had a warrant out for him for murder. The warrant was from Alabama. It seems that defendant was taken before a judge of a Court of Record in Pensacola, where he waived extradition and returned

with the officers to Flomaton, Alabama, where he was lodged in the police jail. The evidence indicates that waiver of extradition under the laws of Florida must be made before a judge of a Court of Record of the State of Florida.

It was in Flomaton police jail that defendant first asked for the services of a lawyer. Sheriff Byrne testified that he told him to use the telephone and call any lawyer of his choice, but not knowing any, the Sheriff gave him the names of some lawyers in Escambia County, Alabama. The defendant did not avail himself of the use of the 'phone and call a lawyer.

The defendant, while so imprisoned in Flomaton, Alabama, and without the advice of counsel, made several inculpatory statements, some of which were later reduced to writing in narrative form, while imprisoned in the county jail at Brewton. The narrative form was admitted in evidence over defendant's objection. The confession bears the purported signature of defendant and was not denied by defendant. There was testimony by Sheriff Byrne that defendant signed the confession.

The State's evidence tends to show that the defendant was neither intimidated, coerced, nor forced to make the statement or to sign the confession; he was not induced to do so, according to the State's contention from the evidence, by a promise of reward or hope of reward. In other words, the tendency of the State's evidence is that the confessions were made voluntarily.

The defendant's evidence tends to show that he made the confessionary statements, both oral and in writing, on the officers' promises that the charge would be changed from murder in the first degree to murder in the second degree so that he could make bond and also escape the electric chair, which he knew was a penalty for first degree murder.

The State's evidence tended to show that before the statements were made defendant was warned that such statements could be used against him, and was also told that he did not have to make a statement, either oral or in writing. Defendant admitted when he testified on the separate hearing before the trial judge with respect to the voluntariness of the confession that the officers told him that he did not have to make a statement.

Before the trial on the merits, defense counsel requested that the hearing on the voluntariness of the confession be heard apart from and out of the presence of the jury. The trial judge granted the request, and the hearing was had before the evidence was heard by the jury. During this hearing and on the main trial it is quite apparent that defendant on more than one occasion prior to the confessionary statements asked for the services of an attorney. At no time was he denied such services, but no attorney was ever furnished him. As before stated, he was handed the telephone and furnished with the names of some lawyers. Defendant was a resident of Florida and knew no attorneys in Alabama.

The written confession reduced to writing by Mr. Lee Otts, County Solicitor (Prosecuting Attorney) for Escambia County, Alabama, reads as follows:

"My name is Grady Vance Boutwell, Jr.—I am 25 years of age—I have been advised that I am talking with the County Solicitor and that any statement I may make may be used against me— I have been informed that I am charged with murder in the first degree. I am aware of the nature of the charge and the punishment therefor—I freely and voluntarily make the following statement and confession in regard to said charge.

"On May 17, 1964 I arrived at Duck's Place in South Flomaton, Florida about 9:30 or 10:00 P.M.—I met Shirley Ann Mosley there—I knew her or I had dated her before. She was not with anyone in particular but was waiting on Mickey Boutwell who she said she had

a date with. I asked her for a date but she said she had one with Mickey at 12:00. I shot the pin ball machine and drank beer until about 12:15 or 12:30. She was there all this time and drank beer with me.

"Before Duck's closed I got 6 beers, 3 Country Club and 3 Slitz. He closed and we went out the side door—we got in my car a 1953 Ford, and went to the Road Side Park between Flomaton and Wabeek on the North side of Highway # 31—we drank some beer and started necking or smootching. I got intimate with her and we were laying in the front seat with her head back against the door. She wanted to stop and I didn't want to. She started scratching me. She had removed all her clothing except her bra and pants and her pants were off down to her legs. I grabbed her and threw her back and when I did her head hit the door and window. I grabbed her around the throat but I thought the blow on her head killed her rather than the choking.

"I didn't know what to do but I thought about taking her down to the twin bridges. I took her clothes off her and drug her down to the creek partially carrying and partially dragging her and threw her in the creek.

"I threw her clothes in the Escambia River down in Florida.

"I threw a pair of my socks that I was wearing into a garden next to my house, the socks were white with a red band around the top.

"The next morning I washed off the outside of my car and took the mats out and squirted them off.

"I make this statement freely and voluntarily of my own free will. No one has threatened me in any manner or offered me any reward or hope of reward in order to get me to make this confession.

"Witness my hand this the 19th day of May, 1964.
          "Grady Vance Boutwell, Jr."

This written confession was taken while defendant was under arrest and imprisoned by a warrant of arrest in the county jail at Brewton, Alabama.

This court in the case of Duncan v. State, 278 Ala. 145, 176 So.2d 840, wrote an exhaustive opinion on the admissibility of a confession that was made by a defendant who did not have an attorney to represent him when he made the confession. It would be an unnecessary duplication of judicial effort again in this case to treat the same subject. This court reviewed at length in the *Duncan* case, supra, recent decisions dealing with the absence of counsel when the accused made a confession.

Suffice it here to say, without further consideration of the pronouncements of this court in the *Duncan* case, and the several cases therein reviewed, that in the case at bar the defendant was not taken by surprise or induced to make a statement unaware that he did not have to do so. He was about 25 years of age, a mature man, and apparently, as we read the record, a man of mental maturity and possessed of reasonable education and reasonable intelligence, at least sufficient to realize that he could keep silent and to know that the statement could be used against him.

■ We think that under the proof of circumstances leading up to the alleged confession that the inculpatory or confessionary utterances from the defendant were admissible, and the trial court free from error in overruling defendant's objections to the admission of the evidence.

■ Appellant filed in the trial court on June 25, 1965, a verified "WAIVER OF RIGHT TO HAVE APPOINTED COUNSEL," as follows:

"The undersigned acknowledges that he is advised and aware of his legal right to secure appellate review of the judgment of conviction and sentence of

law imposed against him before the Honorable Court on April 12, 1965, of his right to be represented by counsel on appeal, and of his right to have counsel appointed to represent him if he is financially unable to obtain counsel, all of which he fully understands. The undersigned now states to the Court that he does not desire to have counsel appointed to represent him on appeal, and hereby expressly waives such appointment, or his legal right to counsel on appeal, as conferred by General Act No. 526, 1963 Alabama Legislature, Regular Session.

"Grady V. Boutwell, Jr.,
Defendant"

In view of the above, we do not think appellant can now complain that he does not have appointed counsel to represent him on this appeal.

No assignment or joinder of errors is here necessary; this court required to consider all questions apparent on the record or reserved by bill of exceptions (transcript of the evidence), and must render such judgment as the law demands. Section 389, Title 15, Code of 1940. We might state parenthetically that the appeal in this case was taken on June 18, 1965. Judgment of conviction was on April 12, 1965

Appellant pro se filed in the trial court on May 12, 1965, a motion for an extention of time in which to file a motion for a new trial. On May 21, 1965, the trial court entered an order as follows:

"The foregoing application for extension of time not having been filed and called to the attention of the court within 30 days from the rendition of judgment in this cause the same is denied."

Appellant complains here that there was error on the part of the trial court in not granting the extension.

Our legislature has provided that motions for new trials in criminal, as well as civil cases, shall be filed by the aggrieved party within thirty days from the date on which a judgment was rendered, after which the trial court shall lose all power or control over the judgment. Title 13, § 119, Code of 1940. No provision is made for an extension of time.

There was no demurrer interposed to the indictment or any challenge made as to its legal sufficiency. Be that as it may, we have examined the indictment and find that it follows the form (79) prescribed in § 259, Title 15, Code of 1940. We think the indictment is legally sufficient. Wilson v. State, 243 Ala. 1, 8 So.2d 422(1).

Appellant filed in this court on September 9, 1965, his motion on transcript paper and in proper form to remand this cause "and the legally insufficient transcript" back to the Escambia County Circuit Court "with instructions to so complete the transcript by adding" certain "designated documents and records thereunto" as follows:

(1) Certified copy of interstate extradition waiver.

(2) Original warrant of arrest, charging defendant with the alleged homicide, secured on or before May 18, 1964, from a legally authorized Escambia County, Alabama, magistrate.

(3) A photostat of the original handwritten confession of guilt, narrated by the county solicitor, Honorable Lee Otts, appearing as State's Exhibit No. 1.

(4) Copy of first and original indictment returned in October, 1964, Escambia County, subsequently dismissed, quashed or stricken.

(5) Copy of order disposing of said indictment.

(6) "Verbatim evidence transcript" compiled by the official court reporter.

We think the above motion should be, and it is, overruled and denied. We now refer to the several documents and records or items mentioned above.

■ It does not appear that item (1) was introduced in evidence by either party. It was not made a part of the proceedings in the trial below; hence we cannot require its production pursuant to the motion.

■ The original warrant of arrest ((2) above) was not introduced in evidence in said nisi prius trial below; or was the validity of said arrest questioned in the trial below; hence, we will not require its production here.

■ The original of the written confession (item (3)) was introduced in evidence and a copy, according to the certificate of the court reporter, appears in the record before us. The reporter certified that the transcript of the evidence which she filed is true and correct, and under such certificate, the confession appearing in the transcript is a true and correct copy of the original. Defendant admitted on the separate hearing that he signed it.

The foregoing certificate of the reporter was in accordance with Act No. 97, Ex.Sess. 1956, Vol. I, p. 143, appvd. Feb. 9, 1956, included in Recompiled Code 1958 as § 827 (1), Title 7. This Act directs the court reporter to copy into the transcript all documents offered in evidence; if impracticable to reproduce such document then to so certify. The reporter is required to notify the parties or their attorneys of record of the filing of the transcript with the circuit clerk. In absence of objections to the certified transcript filed by the court reporter, such transcript shall be conclusively presumed to be correct. Act No. 886, Acts 1951, Vol. II, p. 1527, appvd. Sept. 12, 1951, included in Recompiled Code 1958, as § 827 (1a), Title 7. There were no objections filed in the instant case to the certified transcript.

■ With respect to item (4) of the motion, there is no mention in the record before us of an indictment prior to the one here under consideration. There was no plea filed suggesting a prior indictment or trial thereunder. Therefore such indictment or the disposition thereof (item (5)) is not pertinent to this appeal.

With respect to item (6). We presume appellant refers to a transcript of the evidence compiled by the official court reporter. If so, the original transcript certified by the court reporter is included in the original record before us.

Before concluding this opinion, we want to call attention again to appellant's "WAIVER OF RIGHT TO HAVE APPOINTED COUNSEL" set out above.

In view of this we do not think appellant can now complain that he does not have appointed counsel to represent him on this appeal. Whether or not counsel is appointed, no assignment or joinder of errors is necessary; this court is required to consider, as we have done, all questions apparent on the record, or reserved by bill of exceptions, and must render such judgment as the law demands. Section 389, Title 15, Code of 1940. The appeal here was taken on June 18, 1965.

We have searched the record before us and conclude that the trial court was free from prejudicial error in the trial of defendant, and hold that the judgment of conviction should be, and it is affirmed.

The foregoing opinion was prepared by B. W. Simmons, Supernumerary Circuit Judge, and was adopted by the court as its opinion.

Affirmed.

LIVINGSTON, C. J., and LAWSON, GOODWYN and COLEMAN, JJ., concur.