296 So.2d 764

**In re Buddy Herman MATHIS, alias**

**v.**

**STATE.**

**Ex parte Buddy Herman Mathis.**

**SC 555, SC 556.**

Supreme Court of Alabama.

May 9, 1974.

Rehearings Denied July 11, 1974.

Alvin M. Binder, Jackson, Miss., and R. P. Denniston, Mobile, for petitioner.

William J. Baxley, Atty. Gen., and Joseph G. L. Marston, III, Asst. Atty. Gen., for the State.

PER CURIAM.

Petitions of Buddy Herman Mathis for certiorari to the Court of Criminal Appeals to review and revise the judgments and decisions of that court in Mathis v. State [1973] 52 Ala.App. 674, 296 So.2d 760, and Mathis v. State [1973] 52 Ala.App. 668, 296 So.2d 755.

On preliminary examination, the writs of certiorari were issued and the causes were set down for oral argument. Upon further consideration, after having heard the oral arguments and having studied the briefs and the decisions of the Court of Criminal Appeals, we are now of the opinion that the writs are due to be quashed as having been improvidently granted.

Writs of certiorari quashed.

MERRILL, COLEMAN, HARWOOD, BLOODWORTH, MADDOX and Mc-CALL, JJ., concur.

FAULKNER and JONES, JJ., dissent.

HEFLIN, C. J., not sitting.

BLOODWORTH, Justice (concurring specially).

I concur in the Per Curiam opinion of the majority, but I wish to add the following observations. The dissent would re-verse petitioner's conviction on the ground that the trial court committed reversible error in refusing to grant the motion for change of venue because of pre-trial publicity, despite the admission that "*the reporting was more or less objective* in light of the testimony developed at trial," and in the face of an express finding by the Court of Criminal Appeals that the "*publicity in nowise was to the prejudice of [defendant]*." [Emphasis supplied.]

To reach this result, in my judgment, would represent a departure from well-established and well-founded principles regarding right to fair trial.

As I understand it, the dissenting opinion purports to adopt, as Alabama law, the rationale of a federal circuit court in Doggett v. Yeager, 472 F.2d 229 (3rd Cir. 1973) and § 3.2(c) of the ABA Project on Minimal Standards for Criminal Justice and would hold that a defendant is denied a fair trial anytime there is extensive pre-trial publicity, irrespective of its objective and factual nature. Apparently, prejudice is conclusively presumed from the fact of the mere presence of extensive pre-trial publicity of any character.

The essence of the right to fair trial is the right to an *impartial jury*. Alabama Constitution 1901, Art. I, § 6. See also Duncan v. Louisiana, 391 U.S. 145, 88 S. Ct. 1444, 20 L.Ed.2d 491 (1968). Clearly, a juror does not necessarily lose his impartiality merely by residing in an area in which there has been extensive pre-trial publicity regardless of its character.

Heretofore, it has been held sufficient if the juror can lay aside any impression or opinion he might have had and render a fair verdict based on the evidence presented in court. Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). It is my judgment that such a rule is required in our modern society in which mass media is so pervasive. Criminal prosecutions, especially those involving crimes of a spectacular nature, will naturally be considered newsworthy by the media and will inevitably generate a certain amount of publicity.

If a change of venue or a continuance is to be mandated in every instance where there is extensive pre-trial publicity being disseminated, it will become necessary to grant a change of venue or continuance in virtually *all* criminal prosecutions of any notoriety. Such a rule will virtually eviscerate the right to "a speedy, public trial, by an impartial jury of the county or district in which the offense was committed. . . ." guaranteed by both the Federal and Alabama constitutions. See Alabama Constitution of 1901, Art. I, § 6.

The Federal Constitution requires a change of venue only "where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial . . ." Sheppard v. Maxwell, 384 U.S. 333, 362–363, 86 S.Ct. 1507, 1522, 16 L.Ed. 2d 600 (1966).

While there may be disagreement as to what constitutes proof of a "reasonable likelihood" that a fair trial cannot be had, I believe the accepted test is that expressed by our own Fifth Circuit Court of Appeals in Hale v. United States, 435 F.2d 737 (5th Cir., 1970). In *Hale* the Fifth Circuit held that no reversible error arose because of a trial court's refusal to grant a continuance or to declare a mistrial on the grounds of pre-trial publicity in the absence of demonstrable jury prejudice or highly pervasive, prejudicial publicity. This standard is equally applicable to a trial court's refusal to grant a motion for change of venue.

I do not consider that the standard applied in *Doggett* or that recommended by the ABA Project differs materially from the *Hale* test. The ABA Project provides for change of venue "whenever it is determined that *because of* the dissemination of *potentially prejudicial material*, there is a reasonable likelihood that in the absence of such relief, *a fair trial cannot be had.*" (Emphasis supplied.) *Doggett* also requires that the material disseminated be. *prejudicial.* See 472 F.2d 229 at 238. *Doggett* merely holds that if the defendant proves widespread dissemination of *prejudicial* material, he need not prove actual prejudice or even that the prejudicial material in fact reached the jury.

In the instant case, the Court of Criminal Appeals found that the "publicity in nowise was to the prejudice of [defendant]." While this may be a "legal conclusion" as maintained by the dissent (or at least a mixed question of law and fact), this "conclusion" was based upon findings of fact by the Court of Criminal Appeals that the reporting was "factual," "truthful," "objective," and "reasonably free from any calls for action based upon emotional subjective judgments."

As we have stated many times, the Court of Criminal Appeals is a court of final appellate jurisdiction and for the Supreme Court to evaluate its findings and conclusions based upon the evidence (as opposed to its statements of law) "* * * would run counter to the oft-stated rule to the effect that this court [Supreme Court] on certiorari to review an opinion and judgment of an intermediate appellate court does not review the evidence as contained in the record to determine for ourselves what were the facts of the case." Humphrey v. Boschung, 287 Ala. 600, 253 So.2d 769 (1971).

Therefore, where, as here, there has been no showing of any actual prejudice nor any showing that the pre-trial publicity (although admittedly extensive and widespread) was anything other than "factual," "truthful," "objective," and "reasonably free from any calls for action based upon emotional subjective judgments" (Mathis v. State [1973] 52 Ala.App. 674, 296 So.2d 760, and Mathis v. State [1973] 52 Ala.App. 668, 296 So.2d 755), I am unwilling to presume that the defendant was prejudiced.

And, while Sheppard v. Maxwell, supra, may place upon appellate courts "the duty to make an independent evaluation of the circumstances" surrounding cases involving pervasive pre-trial publicity, the Court of Criminal Appeals already has made such an evaluation in this case. See Mathis v. State [1973] 52 Ala.App. 668, 296 So.2d 755. The conclusion of that court was that

the evidence "in the instant record did not support the defendant's motion for either a further continuance or a change of venue."

Accordingly, I agree that the writ should be quashed as improvidently granted.

MERRILL, COLEMAN, HARWOOD, MADDOX and McCALL, JJ., concur.

JONES, Justice (dissenting).

This appeal is the consolidation of two cases which contain similar questions of law and fact. Buddy Herman Mathis, the appellant, was tried and convicted in two separate trials by the Circuit Court of Mobile County of obtaining money by false pretenses. One case involved kitchen equipment in four Mobile County Schools. The other case involved the removal of debris and repairs to Mobile County schools damaged by Hurricane Camille. The convictions were upheld by the Court of Criminal Appeals. We granted certiorari on certain constitutional grounds, i. e., *fair trial and free press*, which is one of the most viable legal issues of the day.[1]

The question presented is whether or not the trial Court erred in refusing to grant the motion for change of venue because of adverse pre-trial publicity. The majority opinion quashes the writs as improvidently granted. Implicit in this ruling, and as expressed in the concurring opinion, is the conclusion that the "blinder" rule[2] effectively prevents our review of the opinions of the Court of Criminal Appeals. I do not disagree with the "court of last resort" premise on which this rule is based, but I strongly disagree with the majority's appli-

cation of that rule in the instant cases for two basic reasons: 1. The finding by the Court of Criminal Appeals that "This publicity in nowise was to the prejudice of Mr. Mathis" is not a *true* finding of *fact*; it is instead a *legal conclusion* which is indeed the ultimate legal issue treated by that Court as dispositive of these appeals. 2. We are creating the enigma whereby this Court is inviting itself to be reviewed by the United States Supreme Court on a constitutional question that this Court itself has not reviewed.

The "court of last resort" premise, in my opinion, is given full expression by the narrow and limited grounds on which writs of certiorari may be granted (Rule 39). Once the writ is granted, however, which certifies the record of the entire proceedings to this Court, I have never been able to find any valid basis—legal or logical—for the rule requiring this Court to wear blinders and to ignore what that record reveals.[3]

I would grant the writ, reverse and remand with instructions to the Court of Criminal Appeals to set aside the convictions and order new trials; and I would address the merits thusly:

While a detailed consideration of the facts is not necessary to the resolution of these appeals, a brief review may be helpful; accordingly, portions of the two Court of Criminal Appeals' opinions follow.

In the "kitchen equipment" case, Judge Cates, speaking for the Court of Criminal Appeals, stated:

"The appellant, a construction contractor, and the Mobile County School Board

1. See, e. g., The Courts v. The News Media: Is the Conflict Necessary?, Case & Comment, Vol. 79, No. 2 (March–April, 1974).

2. A good statement of this rule is found in Clayton v. Ragsdale, 276 Ala. 321, 161 So.2d 804 (1964): "[O]n a review by certiorari of the judgments and opinions of the court, we are bound by the findings of fact by the Court of Appeals and may not go to the record."

3. The only exception recognized by our cases is stated in a well-reasoned opinion by Justice Coleman in Loyd v. State, 279 Ala. 447, 186 So.2d 731 (1966), holding that the Supreme Court has the right to review the record in a case involving a constitutional question where the Court of Appeals makes *no* finding of fact. See also Ex parte Buck, 291 Ala. 689, 287 So.2d 441 (1973).

entered into a contract for the renovation and repair of kitchen facilities at four Mobile County schools to be done in the 1969 summer vacation. Because of the short time available for completion, the Board awarded the contract without competitive bidding under the 'emergency' provision of the competitive bid law.

"Inasmuch as new equipment was required along with the renovation, the Board authorized its staff to obtain bids on new kitchen equipment . . . It is appellant's conduct in regard to the equipment bidding and purchase that is the subject of this appeal.

"The State introduced evidence tending to show that appellant and an alleged accomplice (an employee of the School Board) approached two commercial kitchen equipment suppliers and requested bids for needed equipment. Appellant allegedly led the equipment suppliers to believe that bids were to be made to him as the general contractor and directed both suppliers to add sums to their bids roughly representing appellant's claimed overhead and profit. These bids were opened in appellant's office.

"The accomplice then presented the upwardly revised bids to the School Board without advising the Board of the padding. The equipment contract was awarded to Mobile Fixture and Equipment Company with a low bid of $99,511.26. Officials of Mobile Fixture testified that their bid before the additions for appellant's 'overhead and profit' was $86,595.00. After adjustments to the contract, a payment of $95,104.26 was made to Mobile Fixture. Mobile Fixture then paid $12,388.26 to the appellant. Testimony of the accomplice indicated that he expected to receive gain from Mathis for his role in the scheme 'down the road.' "

In the "Hurricane Camille" case, Judge Cates briefly set out the facts as follows:

"August 17, 1969, a hurricane came ashore in Mobile County. The Board of School Commissioners awarded a cost plus contract for school repairs to Mathis without public bidding.

"According to the tendencies of the State's evidence, Mathis, with (or at the instigation of) an employee of the Board submitted false invoices from subcontractors. It was inferable that Mathis and this employee advised certain subcontractors and materialmen who had either done little or no work on particular schools, to inflate their bills and kick back to Mathis and his accomplice. In at least one instance they got blank invoice forms of a subcontractor, filled them out, and ran them through the Board's fiscal machinery to their profit.

"Mathis defended, essentially, on a lack of scienter. He was then being harassed by creditors in other undertakings. This financial distraction, he said, kept him from realizing that he was participating in a fraudulent scheme. Mathis claimed, for example, that he thought that he was giving a year's maintenance guaranty on the roofs of the schools involved.

"The State, in rebuttal, countered the thrust of Mathis's testimony by producing the putative accomplice who testified that Mathis participated in the decision to make false invoices and send them to the Board as bills.

"This witness . . . testified without objection that the change from billing for damaged schools to also billing for schools not damaged was prompted by greed, ' . . . partly mine and partly Mr. Mathis's.' "

The purported frauds were first discovered by the *Mobile Press Register* which, in a series of articles, exposed the misappropriation of school funds. The newspaper began the series in December of 1969. On April 10, 1970, Mathis was indicted by a Grand Jury, and arrested two days later. Trial was set for December. The coverage by the media during the interim was heavy and continuous. Mathis was involved in civil litigation connected with the

school fraud scheme, and suffered judgments of $16,000 and $66,000. These cases and the trial of Don Pennell,[4] in which Mathis' name was prominently mentioned, kept Mathis in the public's eye. Because of the great publicity, Mathis' attorney filed motions for change of venue and continuance, but the motions were denied.

From the time the *Press Register* first alleged misappropriation of public funds, until the completion of appellant's trial—approximately a year and one half—more than 800 news articles, contained in 8 volumes of the record. appeared: and appellant's name was repeatedly broadcast over three television and fourteen radio stations.

It is crucial at this point to recognize the outstanding service performed by the dedicated reporting of the media and especially staff reporter Bill Sellers. As the Court of Criminal Appeals commented, the reporting was more or less objective in the light of the testimony developed at trial. While the media is often criticized, the service here performed in standing as centurion of the public trust is a strong commendation for the *free press* that the authors of the First Amendment to the United States Constitution envisaged.

This dissent should in no way be interpreted as a slap at the constitutional guaranties of a *free press*. What this dissent does stand for is the principle that guaranties of the Sixth Amendment stand on an equal footing with the Fifth Amendment; and, accordingly, we must make sure that the fundamental rights asserted by the Sixth Amendment and made applicable to the states by the Fourteenth Amendment are not lost through the abstract application of the First Amendment.

We are not faced with the hypothetical question of releasing one who is actually guilty because of the exercise of the First Amendment right of *free press* to such an extent that the accused cannot get a fair trial in any jurisdiction. All that the defense counsel sought was a change of venue (or a continuance) to assure that his client received a *fair trial* before an *impartial jury*.

While the pre-trial publicity was extensive[5] and the trial judge would have had good cause to grant Mathis' pre-trial motion for change of venue,[6] once the venire was called and *voir dire* commenced, the obvious effect of the publicity should have removed any doubts as to his duty to grant the change of venue motion (or requests for a continuance). With the exception of one panel, the trial judge refused to instruct the prospective jurors not to read news reports, etc., about the trial, and the *voir dire* reveals that in the absence of such instructions, the veniremen continued to be engulfed with publicity even during jury selection.

The Court of Criminal Appeals in applying the law to the facts stated: "This publicity in nowise was to the prejudice of Mr. Mathis."

On *voir dire*, the impact of the pre-trial publicity was evident; almost all prospective jurors testified that they had some knowledge as to the case to be tried. When asked if they could completely divorce this prior knowledge from the facts to be presented at trial and thus render a fair and impartial verdict, numerous prospective jurors gave doubtful responses. This can be illustrated by the *voir dire* examination of Luther James, Jr.

"Q. [Binder] Now, I am concerned as Counsel for Mr. Mathis, Mr. James, with the fact that you know some of the facts of this case, and I want to explain

4. Don Pennell was the employee of the School Board who was the alleged accomplice of Mathis referred to in the Court of Criminal Appeals' opinions.

5. On *voir dire*, one of the jurors, responding to a question by the defense counsel, in effect characterized the pre-trial publicity as the most extensive in Mobile history.

6. In Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the Court, without examining the transcript of the *voir dire*, held that the petitioner was constitutionally entitled to a change of venue from a community that had been saturated with a televised interview of the defendant in which he confessed certain crimes.

my next question to you and I am saying this to you with all due sincerity, I am concerned with the fact that if you were selected as a juror in this case, that perhaps in the next two or three days you might be sitting here as a Juror and something might come from the witness stand that might correlate in your mind and in your subconscious mind some of those facts you previously read about in this case. That is what I am concerned about.

"Now, I am concerned, and I ask you: You can't assure this Court, can you, that if you sat on this Jury and something was said from the stand there that you previously read about in the headlines, that it wouldn't strike a bell and influence you in some manner, you can't promise us that, can you?

"A [James] Honestly, I probably couldn't, subconsciously, it would probably have an effect, subconsciously.

"Q And didn't you read various and sundry subcontractors' testimony in the newspaper about what they had done?

"A Right.

"Q And you have read that testimony?

"A Right.

"Q And you have said to the Court and you can't tell us that may not have an effect on you, you can't say that, can you?

"A No, sir.

"Q In other words, you are going to do your best, if you are chosen as a Juror, to be impartial and you swear to tell the truth, but you don't mean to imply that when you read or when you heard some of the testimony from someone and you had heard some testimony or read some testimony before about that in the Pennell trial, you are not telling us that wouldn't have an effect on you? Isn't that what you are saying?

"A Let's put it this way: I will be honest with you, there is a possibility.

.    .    .    .    .    .

"Q But, you can't assure me absolutely that you would remain a fair and impartial juror with all the facts that have been presented to you?

"A Could anybody?

.    .    .    .    .    .

"Q And you don't think they have had any impression on you and your wife and all the talking you have done about this case?

"A Well, there has been talk and everybody has an opinion.

"Q They do?

"A Well, sure they do.

.    .    .    .    .    .

"Q And do you remember their names [from the pre-trial publicity]?

"A There was a Mr. Crane, Mr. Smith and Mr. Pennell that I recall"

Defense counsel challenged this juror for cause but the trial judge overruled this challenge. The Court of Criminal Appeals stated, "Some jurors when asked if they had fixed opinions gave equivocal answers." An examination of the *voir dire* shows that Mr. James was representative of the venire. And yet, the Court below concluded that "This publicity in nowise was to the prejudice of Mr. Mathis."

The rule, first stated by Justice Holmes in 1907, remains that "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence whether of private talk or public print." Patterson v. Colorado, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907). The Alabama Constitution specifically provides "That in all criminal prosecutions the accused has a right to . . . a speedy, public trial, by an impartial jury of the county or district in

which the offense was committed . . ." Ala.Const. Art. I, § 6 (1901). The United States Supreme Court has held that the Due Process Clause of the Fourteenth Amendment of the Constitution incorporates the guaranties of the right to trial by an impartial jury of the Sixth Amendment; thus it is applicable to state criminal trials. Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

The leading decision in this area of the law is Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), in which the Court set down the basic tenets that should be followed by both trial and appellate courts.

> "Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications' and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances. Of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom. But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity."

In an effort to prevent local publicity from interfering with the right to a fair and impartial trial, one of the procedures most often used by a defendant is to move for a change of venue. This right is authorized in Alabama by statute. Alabama Constitution, Art. I, § 6 (1901); Tit. 15, §§ 267–275, Code of Alabama 1940 (Recomp. 1958). On a motion for change of venue in a criminal case, the defendant has the burden of showing, to the reasonable satisfaction of the trial court, that a fair and impartial trial cannot be had and an un- biased verdict cannot be reasonably expected. Boutwell v. State, 279 Ala. 176, 183 So.2d 774 (1966).

To what degree prejudice must be shown[1] in order to warrant a change of venue in federal court is not well settled, and, in fact, is in much doubt in light of recent decisions. It may well take a decision by the Supreme Court of the United States to effectively settle a dispute which has apparently arisen among the federal circuits. For example, the Fifth Circuit has held that in the absence of demonstrable jury prejudice, or highly pervasive and prejudicial publicity, no reversible error arises because the trial court refused to grant a continuance or to declare a mistrial on the grounds of prejudicial publicity. Hale v. United States, 435 F.2d 737 (5th Cir., 1970).

However, the Third Circuit recently stated, "Not only is it no longer necessary that a defendant show that the jury actually was prejudiced, since *Rideau* it is not necessary to show that prejudicial material actually reached the jury, and thus infected the trial." United States ex rel. Doggett v. Yeager, 472 F.2d 229, 238 (3rd Cir., 1973). The Court in *Doggett* adopted precepts set out by the American Bar Association Project on Minimal Standards for Criminal Justice in Standards Relating to Fair Trial and Free Press (hereinafter referred to as ABA Project), which were also cited by the Court below.

> "3.2 Change of venue or continuance.

> "It is recommended that the following standards be adopted in each jurisdiction to govern the consideration and disposition of a motion in a criminal case for change of venue or continuance based on a claim of threatened interference with the right to a fair trial.

> "  .   .   .

> "(c) Standards for granting motion.

> "A motion for change of venue or continuance shall be granted whenever it

is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. This determination may be based on such evidence as qualified public opinion surveys or opinion testimony offered by individuals, or on the court's own evaluation of the nature, frequency, and timing of the material involved. A *showing of actual prejudice shall not be required*." [Emphasis supplied.]

It is well settled that, although a state must at least meet the minimum safeguards required by the United States Constitution, the state is not limited to those standards, and may impose greater protection. For example, although the Sixth Amendment does not require a twelve-man jury, this Court has stated that the Alabama Constitution confers that right to its citizens. Compare Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), with Collins v. State, 88 Ala. 212, 7 So. 260 (1889). See also Gilbreath v. Wallace, 292 Ala. —, 292 So.2d 651 (1974). Therefore, we need not concern ourselves with the conflicts of the federal circuit courts, but must decide what standards are dictated by Art. I, § 6 of the Alabama Constitution, which consistently has been interpreted as at least meeting, if not surpassing, its federal counterpart. The continual growth of the reach and scope of the news media requires increasingly vigilant protection of the defendant's right to an impartial jury. For that reason, and guided by the high standards imposed by our Constitution, I would adopt the rationale of *Doggett* and the pertinent sections of the ABA Project recommendations.

The role of the appellate court has been expanded by recent decisions. It has been held that, since the grant or denial of a motion for change of venue in a criminal case is a matter of discretion in the trial court, an appellate court will reverse the trial court's ruling only where an abuse of discretion plainly appears. Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1963).

This general rule has been changed by *Sheppard* which adds the requirement that an appellate tribunal must make an independent evaluation of the circumstances and decide for itself if the measures taken by the trial court were sufficiently strong to ensure that the balance did not weigh against the accused. *Doggett*, supra, 472 F.2d at p. 239.

Thus, the two questions which the Alabama Supreme Court should answer are:

(1) Were the materials involved of such a nature as to arouse bias and prejudice towards the appellant, and (2) If the materials were of a prejudicial nature, did the trial court take sufficient precautions in the selection of the jury to prevent this prejudice from invading the courtroom?

The nature, timing, and frequency of the publicity should be carefully weighed with two major considerations in mind at all times—the public's right to know and the individual's right to a fair trial. There will always be a certain degree of publicity surrounding newsworthy criminal prosecutions. To grant a motion for change of venue for every case which has received the slightest degree of notoriety would result in the removal or continuance of virtually every trial. The case at bar, however, has exceptional characteristics.

The media first exposed the alleged wrongdoings and therefore gave them special and widespread coverage. The subject matter, defrauding the public schools, was of an inflammatory and sensational nature. The trial of Don Pennell, in which appellant's name was prominently mentioned, received much coverage. Finally, the coverage was sustained for a year and a half before appellant was brought to trial.

The undeniable effect that these series of articles had upon the community of Mo-

bile County was to arouse public suspicions which centered on a small group of persons among which Mathis was a prominent member. The media reports may well have been factually correct, but this alone would not prevent them from causing prospective jurors to form pre-trial opinions as to the appellant. Rather, it could be that a well-documented report would have the opposite effect in that it would be all the more believable.

I would hold that the denial of the *initial* motion for change of venue (the pre-trial motion) constituted reversible error. Admittedly, a case may be made for the proposition that this was within the discretionary power of the trial court, contending that, while the amount of material was great, the area from which the venire could be drawn was populous and could provide a large reservoir of prospective jurors. Godau v. State, 179 Ala. 27, 60 So. 908 (1913). Assuming, arguendo, the correctness of this initial ruling, we are yet faced with the trial Court's denial of the motion following *voir dire*.

Here, because the publicity was so myriad and widespread, the problem of jury prejudice was a serious one and selection of the jury should have been exercised with great care. The line which divides the prospective jurors into acceptable and unacceptable classes is a fine one causing jury selection to be tiresome and tedious for the jurors and the court. Notwithstanding, the right to a fair trial is so fundamental and basic to American jurisprudence as to require the intricate and time-consuming methods by which an impartial jury may be selected. To sacrifice impartiality in the interest of expediency is the ultimate denial of due process.

The guidelines which a trial judge must follow in this task are imprecise. He must balance the ideals inherent in the words of the Alabama and United States Constitu-

tions with the realities of a society with swift and diverse communications media. The selection of a jury completely free from knowledge of the case is not constitutionally compelled. "It is not required . . . that jurors be totally ignorant of the facts and issues involved . . . It is sufficient if the juror can lay aside his impression or opinion and render a fair verdict based on the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642–1643, 6 L.Ed.2d 751 (1961).

Although knowledge of certain facts of the case by prospective jurors in and of itself cannot be equated with jury prejudice, it signals the need for a careful and searching *voir dire* to insure that the minimum constitutional guaranties are met.

In the instant case, while the spirit of the first aspect of this rule was fully complied with by permitting counsel wide latitude in his examination of prospective jurors, the Court negated its effective purpose by denying the motion for change of venue in face of the information developed on such *voir dire*. Otherwise stated, unless the second aspect of the rule—to insure the minimum constitutional guaranties—is complied with, the wide latitude of *voir dire* is rendered perfunctory at best, or a compounding of the prejudicial effect at worst, in the context here applicable.

Because of the tremendous pre-trial publicity which permeated the community—and its potentially prejudicial effect—the prudential course would have been to grant the original motion for change of venue; and, while I would so decide, the continued responses showing prior knowledge and opinions of the case by prospective jurors should have removed any doubt as to the proper course. In my opinion, then, the denial of the motion for change of venue *following* the selection of the jury was reversible error.

The ABA Project set the standard to be followed in the selection of a jury in cases in which questions of possible prejudice are raised.

"3.4 Selecting the jury.

". . .

"(b) Standard of acceptability.

"Both the degree of exposure and the prospective juror's testimony as to his state of mind are relevant to the determination of acceptability. A prospective juror who states that he will be unable to overcome his preconceptions shall be subject to challenge for cause no matter how slight his exposure. If he has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his judgment will be affected, his acceptability shall turn on whether his testimony as to impartiality is believed. If he admits to having formed an opinion, he shall be subject to challenge for cause unless the examination shows *unequivocally* that he can be impartial. A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to his testimony as to his state of mind." [Emphasis supplied.]

The right to a trial by a fair and impartial jury is fundamental to the ideal of due process. When an appellate court finds the defendant has received anything less than our Constitution requires, it has a duty to overturn the conviction and remand for a new trial. I would so find and I would reverse and remand.

FAULKNER, J., concurs.