The appellant was indicted and convicted of first degree robbery in violation of Alabama Code § 13A-8-41 (Supp. 1977). It being ascertained at appellant's sentencing hearing that he had been convicted of felony offenses on three or more prior occasions, the trial court, in accordance with Alabama's Habitual Offender Act, fixed punishment at life without parole in the state penitentiary. At arraignment, in the presence of counsel, appellant pleaded not guilty to the charges. Appellant is represented on this appeal by court-appointed counsel and has been furnished with a free transcript.
The state's evidence, which included the accounts of two eyewitnesses to the crime, was sufficient to prove appellant's guilt beyond any reasonable doubt. Mr. Everette "Sonny" Helms, one of the eyewitnesses to the crime and the victim named in the indictment, testified that he was the owner of H B Jewelers in Gadsden. Mr. Helms first noticed appellant drive very slowly by his store in a large dark automobile around 1:00 p.m. on February 23, 1981. Appellant was sitting on the passenger side of the car. *Page 1206 
Later that afternoon, around 3:00 p.m., Mr. Helms purchased a television set and as he walked back to his jewelry store carrying the set he saw appellant "coming down the block towards me." Mr. Helms stated that, after he had entered the store and had walked a short distance inside, he heard the door open. He turned around and saw appellant holding a pistol "pointed towards me." Mr. Helms described the revolver as having a blue gun barrel. "I would guess it was a 38, but I am not sure of the caliber."
Appellant ordered Mr. Helms and Miss Dawn Phillips, a store employee and the other eyewitnesses to the crime, "to get on the floor." Mr. Helms lay face down on the floor and as Miss Phillips started to do the same, appellant ordered her to lock the front door and "start clearing the jewelry case." While Miss Phillips was complying with these demands, under threat of being shot or killed, appellant knelt beside Mr. Helms, placed a knee in his back and held the pistol against the back of his head. Appellant further ordered Mr. Helms to take off his rings. Appellant placed these rings, valued at approximately $9,000, in his pocket. The jewelry Miss Phillips had gathered from the showcase and had placed in a trash bag was valued at approximately $32,000. During the time appellant was collecting the jewelry and was holding his pistol to the back of Mr. Helms's head, appellant conversed with Mr. Helms about Mr. Helms's former business partner, Joe Bearden, and Bearden's brother, Phillip. Mr. Helms testified that as appellant was ordering Miss Phillips to "start down the hall towards the back," he told me "that when he found Phil that I would get my jewelry back." Appellant then struck Mr. Helms across the head with the pistol. Mr. Helms stated that the blow "cut my head open" and required several stitches.
Miss Phillips testified that, after appellant told her "to go back and unlock the back door", she heard appellant hit Mr. Helms in the back of the head. "I started running to the back door and he yelled at me to slow down or he'd kill me." Miss Phillips stated that she "tried to slow down" and was able to unlock the back door. "He had come up behind me and he hit me on the back of the head, and I fell to the ground."
Mr. Helms testified that, after appellant and Miss Phillips started down the hall, he waited until he heard the first door in the back of the shop open. Mr. Helms fired four shots at appellant as he made his escape. "I believed that I did hit him." Appellant dropped the bag of jewelry in the back doorway, but fled with Mr. Helms's rings. Miss Phillips notified the police department.
Mrs. Dorothy Singleton testified that, around 3:15 or 3:30 p.m. on the date in question, she saw appellant running "from the building, and he jumped into a car." Appellant got in the passenger side. The car's motor was running and it took off very quickly. Mrs. Singleton identified the car as a green Pontiac, memorized the tag number and called the police.
Captain Jerry Bone of the Gadsden Police Department testified that the vehicle Mrs. Singleton had described was located at the intersection of Highway 227 and Highway 11 in Reese City a short time after the robbery was reported. Captain Bone saw blood inside the car on the passenger side of the front seat. Around 4:00 p.m., appellant approached the group of officers gathered at the vehicle and made the following spontaneous exclamation to Captain Bone: "I am the fellow you are looking for. . . . I have been shot. I need to go to the hospital." Appellant received a standard pat down before he was taken to the hospital. Mr. Helms's rings were discovered in appellant's windbreaker jacket.
There can be no question from the foregoing facts that the jury's verdict was well supported. Every element necessary to prove a prima facie case of first degree robbery was firmly established. Alabama Code § 13A-8-41 (Supp. 1977). See Marvinv. State, Ala. Cr. App., 407 So.2d 576 (1981). The testimony of an eyewitness, standing alone, is sufficient to support a defendant's conviction for robbery. Williamson v. State,384 So.2d 1224 (Ala.Cr.App.); Williams *Page 1207 v. State, 367 So.2d 990 (Ala.Cr.App.); Arnold v. State,348 So.2d 1092 (Ala.Cr.App.), cert. denied, 348 So.2d 1097 (Ala.).
It cannot be seriously contended that appellant did not intend to "deprive" Mr. Helms of his property. Appellant's bare statement that Mr. Helms would get his jewelry back as soon as he found Phil in no way negates the fact that a robbery occurred. Such argument is wholly without merit. Mr. Helms assuredly was "deprived" of his property within the meaning of the applicable statutes. Alabama Code §§ 13A-8-41, 13A-8-43,13A-8-2 (Supp. 1977) and Alabama Code § 13A-8-1 (2) (Supp. 1981).
Appellant's motion for change of venue was properly denied by the trial court. The trial court conducted a pretrial hearing relative to appellant's motion and it was ascertained that pretrial publicity had been broadcast in the Gadsden area by newspaper and radio concerning the robbery. Radio broadcasts were aired on four separate days and the Gadsden Times carried front page reports about the crime on February 24 and 25, 1981. Both the newspaper accounts and the radio transmissions mentioned appellant by name. We have carefully reviewed this evidence and find no error in the trial court's ruling.Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507,16 L.Ed.2d 600 (1966).
The granting of an accused's motion for change of venue rests within the sound discretion of the trial court and its ruling thereon will not be disturbed except for gross abuse. Cobern v.State, 273 Ala. 547, 142 So.2d 869 (1962); Burnett v. State,350 So.2d 718 (Ala.Cr.App. 1977). As this court stated inAnderson v. State, 362 So.2d 1296, 1298-1299 (Ala.Cr.App. 1978):
 "Section 15-2-20, Code of Alabama 1975, authorizes a defendant to have his trial removed to another county if he cannot receive a fair and impartial trial in the county in which the indictment is found. Gilliland v. State, 291 Ala. 89, 277 So.2d 901
(1973). However the existence of widespread publicity alone does not indicate that a defendant will not get a fair trial. The law focuses on the impartiality of the trial jury. Turk v. State, 348 So.2d 878
(Ala.Cr.App. 1977); Mathis v. State, 52 Ala. App. 668, 296 So.2d 755, cert. quashed, 292 Ala. 732, 296 So.2d 764 (1973); cert. denied, 419 U.S. 1106, 95 S.Ct. 777, 42 L.Ed.2d 802 (1975). Actual prejudice directed toward the accused resulting from the extensive publicity must be shown. Botsford v. State, 54 Ala. App. 482, 309 So.2d 835 (1974), cert. denied, 293 Ala. 745, 309 So.2d 844 (1975); Annotation, 33 A.L.R.3d 17 (1970).
 "On motion for a change of venue in a criminal case, the defendant has the burden of showing, to the reasonable satisfaction of the court, that a fair and impartial trial cannot be had and an unbiased verdict cannot reasonably be expected. Boutwell v. State, 279 Ala. 176, 183 So.2d 774 (1966); Godau v. State, 179 Ala. 27, 60 So. 908 (1913).
 "Newspaper articles, without more, are not evidence on a motion for change of venue; their effect must be shown. Beddow v. State, 39 Ala. App. 29, 96 So.2d 175
(1956), cert. denied, 266 Ala. 694, 96 So.2d 178
(1957), 355 U.S. 930, 78 S.Ct. 412, 2 L.Ed.2d 414
(1958).
 "Except in the situation where there is a showing of `inherently prejudicial publicity which has so saturated the community, as to have a probable impact upon the prospective jurors', the trial court's primary responsibility in dealing with allegedly prejudicial pretrial publicity is whether, as a result of such publicity, it is reasonably unlikely that the defendant can secure a fair and impartial trial. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); United States v. Jones, 542 F.2d 186 (4th Cir. 1976); McWilliams v. United States, 394 F.2d 41
(8th Cir. 1968).
 "In Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975), the United States Supreme Court recognized that: *Page 1208 
 "`Qualified jurors need not, however, be totally ignorant of the facts and issues involved.
 "`"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. (Citations omitted.)"'
 "At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality."
 "Recently the Supreme Court affirmed the principles expressed in Murphy.
 "`Petitioner's argument that the extensive coverage by the media denied him a fair trial rests almost entirely upon the quantum of publicity which the events received. He has directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected. But under Murphy, extensive knowledge in the community of neither the crimes nor the putative criminal is sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere utterly corrupted by press coverage."' Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344
(1977).
 "The proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination."
Both the transcript that was originally filed in this case and the supplemental transcript that was later submitted to this court in compliance with the trial court's order demonstrate that the prospective jurors were broken down into four panels of twelve[1] for voir dire questioning by the state and by appellant's counsel. Each panel of prospective jurors was subjected to rigorous and thorough examination regarding the publicity concerning the robbery. Of the fifty-one prospective jurors, thirty-two subscribed to the Gadsden Times. Some of these thirty-two remembered reading the articles reporting the robbery. Even fewer remembered seeing appellant's picture. From a close examination of the record it is apparent that a greater number of the thirty-two subscribers did not remember reading the articles or seeing the picture. Again, of the fifty-one prospective jurors, some heard radio broadcasts concerning the robbery. However, without exception, none of the prospective jurors felt that they would be prejudiced or biased against appellant because of any radio transmission or newspaper articles. None of the fifty-one jurors so questioned expressed any doubt whatsoever that they would be able to return a fair and impartial verdict. From these facts we believe that the jury was impartial and adhered to its sworn duty to base its verdict upon the evidence adduced and the law as expounded by the court's instruction. Bowen v. State,274 Ala. 66, 145 So.2d 421 (1962); Anderson, supra. The fact that jurors knew of the case did not establish that at the time of empaneling they were biased against the defendant where they swore that their knowledge would not affect their judgment.Hale v. United States, 435 F.2d 737 (5th Cir. 1970), cert. denied, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971). Absent inherently prejudicial publicity which has so saturated the community as to have a probable impact upon the prospective jurors, *Page 1209 
there must be some showing of a connection between the publicity generated by the news articles, radio and television broadcasts, and the existence of actual jury prejudice.Anderson, supra.
The trial court correctly overruled appellant's Motion to Quash the Indictment or, in the alternative, to Quash the Venire. Appellant contends that lower income groups were unlawfully excluded from jury service because the Clerk of the Etowah County Jury Commission used driver's license lists provided by the Department of Public Safety in filling the jury box with prospective jurors. There is no merit to this contention.
Mrs. Ruth Moon, the Clerk of the Etowah County Jury Commission, testified that the Jury Commission had been using the driver's license list only in compiling the jury roll. There were then 65,000 prospective jurors on the jury roll in Etowah County. Mrs. Moon stated that, prior to using the driver's license lists only, the Jury Commission had used the voters list, the car tag list and the driver's license list. This process had resulted in some 147,000 names being placed on the jury roll whereas the population of Etowah County was between 95,000 and 100,000.
From Mrs. Moon's testimony there can be no question that the requirement of Alabama Code § 12-16-57 (Supp. 1981) was fully met in compiling the master jury list for Etowah County. Alabama Code § 12-16-57 (a) (Supp. 1981) reads as follows:
 "(a) The jury commission for each county shall compile and maintain an alphabetical master list of all persons in the county who may be called for the jury duty, with their addresses and any other necessary identifying information. This list may include all registered voters, persons holding drivers' licenses and registering motor vehicles, and may include other lists, such as lists of utility customers and persons listing property for ad valorem taxation, which will include persons whose listing will foster the policy and protect the rights provided in sections 12-16-55 and 12-16-56. This list shall avoid duplication of names. The list shall be reviewed and corrected and new names added from time to time, but at least once every four years." (Emphasis added.)
The law in Alabama does not require, literally, that every qualified person's name be placed on the rolls or in the box.Mitchell v. Johnson, 250 F. Supp. 117 (M.D.Ala. 1966). Failure to include the name of every qualified person on the jury roll is not a ground to quash an indictment or venire, absent fraud or purposeful discrimination. Swain v. Alabama, 380 U.S. 202,85 S.Ct. 824, 13 L.Ed.2d 759 (1965).
There is no substance to appellant's allegation that the prosecution systematically excluded blacks and hispanics by use of its peremptory strikes. Appellant's jury, in fact, contained two blacks and one individual of hispanic descent. This question has been treated time and time again by this court. See Ben Allen, III v. State, Ala. Cr. App., 414 So.2d 163, 1982;Thigpen v. State, 49 Ala. App. 233, 270 So.2d 666 (1972).
The jury's verdict in this case was returned on May 21, 1981. Appellant was sentenced on August 3, 1981, at the conclusion of the sentence hearing. Appellant contends this passage of time resulted in a denial of his right to a speedy trial as guaranteed by the Sixth Amendment of the United States Constitution. We disagree.
This court in Noe v. State, 391 So.2d 151, 152 (Ala.Cr.App. 1980), speaking through Judge DeCarlo, stated:
 "It is well settled that the passage of time alone will not bar imposition of a sentence or require an accused's discharge. In order to assert that speedy trial was denied, the delay must be purposeful or oppressive. United States v. Grabina, 2d Cir., 309 F.2d 783. Whether the delay amounts to a deprivation of an accused's right to a speedy trial depends upon the circumstances of the particular case. Pollard v. United States, 352 U.S. 354, 77 S.Ct. 481, 1 L.Ed.2d 393."
It was determined in Noe, supra, that a thirteen-month interval between judgment *Page 1210 
and sentencing was not a deliberate or an unjustifiable delay on the part of the state.
Here, the passage of some two and one-half months between the jury verdict and the date of sentencing was not unreasonable. In the interim it was necessary for the prosecution to locate out-of-state witnesses who could offer evidence concerning appellant's prior felony convictions and procure their attendance in court in Alabama. This evidence was necessary for appellant to be properly sentenced as a recidivist. It cannot be said that the state acted oppressively.
As the Supreme Court recognized in Bozza v. United States,330 U.S. 160, 166, 67 S.Ct. 645, 91 L.Ed. 818 (1947):
 "This Court has rejected the `doctrine that a prisoner, whose guilt is established by a regular verdict, is to escape punishment altogether because the court committed an error in passing the sentence.' (Citation omitted.) The Constitution does not require that sentencing should be a game in which a wrong move by the judge means immunity for the prisoner."
We have reviewed the issues in this case as presented by appellant. In addition, we have searched the record, as required by law, for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.
[1] The Supplemental transcript indicates that panel four contained fifteen prospective jurors. (Supp. R. 69-72, 85).